JOHN W. MARTIN, GOVERNOR OF THE STATE OF FLORIDA; ERNEST AMOS, COMPTROLLER OF SAID STATE; J. C. LUNING, TREASURER OF SAID STATE; J. B. JOHNSON, ATTORNEY GENERAL OF SAID STATE, AND NATHAN MAYO, COMMISSIONER OF AGRICULTURE OF SAID STATE, AS TRUSTEES OF THE INTERNAL IMPROVEMENT FUND OF THE STATE OF FLORIDA, *Appellants*, v. CLARENCE M. BUSCH, AS TRUSTEE FOR CLARENCE M. BUSCH, BONNIE M. BUSCH, FREDERICK W. WHITE, PANSY B. WHITE, W. RUSSELL OSBORN AND ADA W. OSBORN, *Appellees*.

Division B.

Opinion Filed March 15, 1927.

1. When in July, 1821, the United States took possession of "all the territories * * * known by the name of East and West Florida" and "the adjacent islands" that were ceded by Spain and afterwards incorporated into the Territory of Florida, the laws of the United States became applicable, and the United States took and held the lands under the navigable waters, including the shores or spaces between ordinary high water marks and tide lands, for the use and benefit of the State that was to be subsequently formed with rights of sovereignty. Such lands were not granted by the United States while Florida was a Territory.

2. Upon the admission of Florida into the Union by Act of Congress of March 3, 1845, the State, by virtue of its sovereignty, became the owner of all lands under the navigable waters within the State, including the shores or spaces if any between ordinary low water mark and ordinary high water mark, and also all tide lands, *viz.*, lands covered and uncovered by the daily ebb flow of normal tides.

3. Lands under navigable waters to ordinary high water mark and tide lands may for convenience be designated as sovereignty lands, since they belong to the State by virtue of its sovereignty in consequence of becoming a State in 1845.

4. The navigable waters in the State include lakes, rivers, bays or harbors, and all waters capable of practical navigation for useful purposes whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or whether the waters are navigable during the entire year or not.

5. In 1845 the State by virtue of its sovereignty upon being admitted to the Union became the owner of, and unless lawfully conveyed or granted, still owns the beds of all navigable lakes to ordinary high water mark, however shallow the water may be at the outside lines or elsewhere if the water is in fact a part of the particular lake that is navigable for useful purposes.

6. In flat territory or because of peculiar conditions, there may be little if any shore to navigable waters, or the elevation may be slight and the water at the outer edges may be shallow and affected by vegetable growth or other conditions, and the line of ordinary high water mark may be difficult of accurate ascertainment; but when the duty of determining the line of high water mark is imposed or assumed the best evidence attainable and the best methods available should be utilized in determining and establishing the line of true ordinary high water mark, whether it is done by general or special meandering or by particular surveys of adjacent land.

7. Marks upon the ground or upon local objects that are more or less permanent may be considered in connection with competent testimony and other evidence in determining the true line of ordinary high water mark of navigable waters.

8. When the line of ordinary high water mark of navigable bodies of water is duly ascertained and established by competent authority, such line should be regarded as the true line unless duly impeached for fraud or mistake.

9. The lands below ordinary high water mark of Lake Okeechobee, a navigable body of water, are State sovereignty lands, while the lands above ordinary high water mark are, in the locality here considered, swamp and overflowed lands.

10. Where lands below high water mark of navigable bodies of water are claimed, the right thereto should be specifically shown, since such ownership is exceptional.

11. In suits for the removal of clouds from title, as a general rule, an allegation in the bill that complainant is the owner in fee of the lands in question, and in the actual possession thereof, or that the lands are wild, unimproved, or unoccupied, if such be the case, is sufficient, without setting out in detail the facts showing such ownership, as ownership is the ultimate fact and the others are mere evidentiary facts. If, however, in addition to an allegation of ownership in fee, the facts which constitute the title, of whatever nature they may be, are also set out, and such facts show title not to be in the complainant, a demurrer to the bill will lie.

12. While ordinarily a meander line is not necessarily a boundary line when conveyances do not expressly make the meander line one of the calls of the boundary, yet where a meander line is run under State authority for the purpose of identifying, locating and establishing the true line of ordinary high water mark of a body of navigable water, and the lands below high water mark are sovereignty lands and the lands above high water mark are swamp and overflowed lands or other uplands subject to ordinary private ownership, in such case the meander line, if so intended and if duly and fairly ascertained and established, becomes, and, unless duly impeached, continues to be, a boundary line limiting the extent of conveyances of the adjacent uplands or of permissible grants or conveyances of the sovereignty lands below high water mark.

13. In United States Patent No. 137, dated April 29, 1903, conveying unsurveyed swamp and overflowed lands to the State of Florida, pursuant to the Act of Congress, approved September 28, 1850, a description of a boundary line as "around the shores of Lake Okeechobee and northerly along said lake," has reference to the ordinary high water mark of the navigable lake.

14. Lake Okeechobee, being a navigable lake. the bed of the lake, including the shores between ordinary high and low water marks, belonged to the State by virtue of its sovereignty upon the admission of the State into the Union by the Act of March 3, 1845, and such bed of the lake is not included in the grant of September 28, 1850, of swamp and overflowed lands, therefore the lands covered by the Patent No. 137 of unsurveyed swamp and overflowed lands, extended only to ordinary high water mark around the navigable lake.

15. The deed of conveyance No. 15,898, made by the Trustees of the Internal Improvement Fund of Florida, dated December 28, 1904, was of unsurveyed swamp and overflowed land only ; and the conveyance contemplated a survey of the lands under State authority.

16. An attempted exercise of private ownership rights in sovereignty land below ordinary high water mark of navigable bodies of water, under a conveyance of unsurveyed swamp and overflowed lands, gives no right or title to sovereignty lands below ordinary high water mark of a navigable lake, though the boundary line between sovereignty land and swamp and overflowed land had not then been located under State authority.

17. When the State through its authorized agency, makes sales or conveyances of unsurveyed lands bordering on the shores of navigable waters, it is the duty of the State to officially determine the limits and existing boundaries of the sovereignty lands under navigable waters on which the sold or conveyed lands border ; and when such boundaries are duly established, sales or conveyances of adjacent lands are to be regarded as made with intent that such sales and conveyances shall and do conform to the boundary lines thus established between the sovereignty lands held by virtue of the Act of March 3, 1845, and the swamp and overflowed land acquired by the State under the Congressional Act of September 28, 1850, or other lands that may border on sovereignty lands.

18. The Trustees of the Internal Improvement Fund had no authority in 1904 to convey land below ordinary high water mark of a navigable lake, and such Trustees did not attempt to convey any such sovereignty lands by Deed No. 15,898, dated December 28, 1904, in which they conveyed an "estimated acreage" of *unsurveyed* lands "embraced between the line of existing surveys and the margins of the Okeechobee and tributaries, and more particularly designated by what would be the projections of the existing lines of survey as follows: * * * all unsurveyed sections * * * 11, 12 * * * T. 43 S. R. 32 E."

19. The authority of the Trustees of the Internal Improvement Fund as to the swamp and overflowed lands granted to the State by the Act of Congress of September 28, 1850, and as to the submerged and marsh land that belong to the State by virtue of sovereignty, are separate and distinct trusts and powers conferred for different purposes by statutes enacted many years apart, the principal statute as to the swamp and overflowed lands (Chapter 610) having been enacted in December, 1855, and approved January, 1856, and the statutes giving authority as to submerged and marsh lands were enacted in 1919.

20. The only purpose for which the official survey of the meander line of Lake Okeechobee was authorized and made under State authority in 1917-1918, was to ascertain and determine and locate and establish by State authority the line of ordinary high water mark of the navigable lake, so that the true dividing line between the sovereignty lands under the waters of the lake to ordinary high water mark and the adjacent swamp and overflowed lands could be known and observed in locating the boundaries of unsurveyed land on the margin of the lake.

21. The correctness of the official meander line as the true ordinary high water mark of the navigable lake dividing sovereignty lands and swamp and overflowed lands not being impeached by the evidence in this case, but confirmed by such evidence, it must stand as the true line of the ordinary high water mark of the navigable lake.

22. The Trustees of the Internal Improvement Fund in 1904 had no authority to convey sovereignty lands below high water mark of Lake Okeechobee, therefore the conveyance made on December 28, 1904, by the Trustees is, by law as well as by the intendments of its terms, limited to the line of the ordinary high water mark of the navigable lake to be established by competent authority as contemplated by the conveyance as made.

23. The State Trustees cannot by allegation, averment or admission in pleadings or otherwise affect the legal status of or the State's title to sovereignty, swamp and overflowed or other lands held by the Trustees under different statutes for distinct and definite State purposes.

24. A riparian owner is one who owns to the line of ordinary high water mark on navigable waters.

25. Riparian owners in this State usually have title to ordinary high water mark of navigable waters; the lands below such mark belong to the State by virute of its sovereignty, and are not held for ordinary private ownership purposes.

26. If to serve a public purpose the State, with the consent of the Federal authority, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high water mark, the lands so uncovered below such high water mark, continue to belong to the State.

27. Reliction is the term applied to land that has been covered by water, but which has become uncovered by the imperceptible rescission of the water.

28. The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies as by drainage operations.

29. The Riparian Acts of 1856 and 1921 apply only to "any navigable stream, bay of the sea or harbor." The latter statute by express provision does not "apply to lakes, ex-

cept tide water lakes," and Lake Okeechobee is not a tide water lake.

30. Chapter 7892, Acts of 1919, validated all land surveys approved by the Chief Drainage Engineer for the Trustees of the Internal Improvement Fund, and does not validate any other surveys.

31. The authority given by the State to survey the line of high water mark of a navigable lake and the survey made must be held to mean ordinary high water mark in this case in the absence of a contrary showing.

32. An avernment by the Trustees of the Internal Improvement Fund that Deed No. 15,898 conveying unsurveyed swamp and overflowed lands had reference to the "Keller Survey" and that such survey was to all intents and purposes identical with the "State Survey" subsequently made is not availing to opposing claimants for reasons stated in the opinion herein.

An Appeal from the Circuit Court for Glades County; George W. Whitehurst, Judge.

*Marvin C. McIntosh,* for Appellants;

*Mabry, Reaves & Carlton,* for Appellee.

### STATEMENT.

The bill of complaint filed herein against the Trustees· of the Internal Improvement Fund of the State of Florida, January 20, 1923, by Clarence M. Busch, as trustee, &c., alleges "that he is the legal owner of the following described lands in Glades County, Florida, to-wit:

"Beginning at a point in Section 12, Township 42 South, Range 32 East, where the Southern right-of-way line of the Atlantic Coast Line Railroad intersects the irregular

lines of a survey made under the supervision of F. C. Elliott, for the Trustees of the Internal Improvement Fund in 1917-1918, commonly known as 'State Survey;' thence following the line of said survey in its irregular and varying course· to the point where it intersects the Southern right-of-way line of the said railroad in Section 11, Township 42 South, Range 32 East; thence along the Southerly right-of-way of said A. C. L. Railroad in a Southeasterly direction to the point of beginning, being that strip or portion of land lying between the Southerly line of the right-of-way of the said A. C. L. Railroad and the said irregular survey line, and constituting a part of the site of the town of Moore Haven as originally platted and recorded in the Public Records of DeSoto County, Florida, and embracing about —— acres.

"That he claims title to said lands through the Trustees of the Internal Improvement Fund of Florida, and that the title thereto came to your orator in the following manner, namely, said lands were never surveyed by the United States, but were patented by the· United States to the State of Florida as overflowed lands under 'the Act of Congress relating to swamp and overflowed lands, by and under which numerous lands in various sections of the State have been patented to the State of Florida by the United States at various times, and that the said lands in said patent to the State were described by metes and bounds, the same not having been theretofore surveyed; that after acquiring said lands the State of Florida, .through the Trustees of the Internal Improvement Fund, conveyed the same as a part of a large body of land to John W. Henderson *et al.*, as heirs-at-law of John A. Henderson, deceased.

"And thereafter, to-wit, by deed dated the 20th day of October, 1914, the said John W. Henderson *et al.*, who had so acquired the title from the said Trustees of the Internal

Improvement Fund by their said deed bearing the date aforesaid, conveyed said lands to your orator; that said lands, as appears from the said deeds, were conveyed as unsurveyed lands, the same not having been surveyed prior to the issuing of said deeds, and each of them, and your orator alleges that by virtue of said deeds, and mesne conveyances he acquired title to and now holds the legal title to the lands hereinabove described in trust as herein stated.

"After acquiring the said land in the manner hereinabove stated, your orator and his predecessors in title developed and improved the same at large expense, and among other things, promoted the Town of Moore Haven, and platted and laid off said town and recorded the map thereof, which said map embraces and includes that part of the land hereinabove described lying North of the 3-Mile Canal, and your orator built upon and improved some of the lots in the said described portion of land, while others and a majority of said lots have not been built upon nor improved, and same are at the present time unoccupied and unimproved; that the defendants are not in possession of any part of the said described lands, and your orator is in actual possession of very few of the lots so described, but that the said Town of Moore Haven, in said Section 11 has been greatly developed and improved, and is a thriving town with a population of several hundred inhabitants.

"That the defendants claim some right or interest in and to the said lands so described and colored red on the attached map, the nature of which your orator does not know, but your orator alleges that whatever the basis of said claim the same is without foundation in law.

"That by reason of the claim of the said defendants and because they have repeatedly asserted some claim, and have since the said town was platted and the plat thereof recorded, caused to be made a survey as indicated and

marked 'State's Survey' on the said map hereto attached, and have asserted a claim to all that said portion of land herein described as lying between said survey and the right-of-way of said A. C. L. Railroad; that because of said assertions of title on the part of defendants, a cloud has been cast upon the validity of your orator's title, and the said property has been rendered unsaleable; that unless and until your orator's title shall be quieted as against the unfounded assertions of title on the part of the defendants, the said property cannot be sold and will not be improved,'' &c.

The prayer is ''that the defendants be required to answer this, but not under oath, answer under oath being waived; that the defendants be required to set up and aver what manner of claim, interest or title they have or assert to said property; that Your Honor shall take testimony according to the rules and practice of this Court, and shall adjudge and decree that the said defendants have no legal claim, title or interest in said property, but that same is the property of your orator, and that the assertion of claim and ownership made by the said defendants be declared to be null and void, and that the said defendants be enjoined from further asserting or claiming title to said lands, or any part or parcel thereof.''

A demurrer to the bill of complaint was field by the defendant trustees, which demurrer was overruled.

By answer the defendants denied that complainants are the legal owners of or have any legal or equitable title in and to the described lands:      *      *      *

''Defendants admit that the said lands were never surveyed by the United States, but these defendants deny that the plaintiff, Clarence M. Busch, ever acquired title to the said lands through the defendants, or that the said lands were ever patented by the United States to the State

of Florida as swamp and overflowed lands under the Swamp Land Grant Act of September 28, 1850, or under any Act of Congress.

"Defendants admit that the State of Florida has from time to time acquired large tracts of land pursuant to the provisions of the Swamp Land Grant Act of September 28, 1850, but these defendants deny that the foregoing described lands were ever covered by the provisions of the said Act or that they came to the State of Florida thereunder, or that they have at any time conveyed the said lands to John W. Henderson and others as heirs at law of John A. Henderson, deceased.

"These defendants have never been and are not familiar with the deed dated October 20, 1914, executed by John W. Henderson and others to the plaintiffs herein, conveying certain lands therein described to them, but they aver that at the time of the execution of the said deed, the title to the foregoing described lands was in the State of Florida, where it has continued to remain to this date, and the said John W. Henderson and others were without authority to convey the said title to the said lands to the complainants.

"Defendants admit that the Town of Moore Haven is a thriving town of several hundred people, located partially in that part of Section 11, Township 42 South, Range 32 East, Glades County, Florida, as attested in the bill of complaint; that the said town was promoted by complainants and that complainants prepared and filed for record a map of the said town, but these defendants aver that that portion of Section 11 as above was not at the time of the platting and projecting of the Town of Moore Haven, nor has it at any time since been the property of the complainant, but under the laws of this State the title to said lands is vested in the defendants and held by them in trust for the people of the State of Florida.

"Defendants say that the 'STATE SURVEY' therein referred to was made for the purpose of indicating the meander of Lake Okeechobee, which meander was substantially the normal high water mark of the said lake, and that the said STATE SURVEY has been validated and was fully authorized by Chapter 7891, Acts of 1919, Laws of Florida; that all the lands lying between the STATE SURVEY and the A. C. L. Railroad, including the lands described in the bill of complaint, were until recently part of the bed of Lake Okeechobee; that the said lands were reclaimed by the drainage operations of Everglades Drainage District and the lowering of said lake, and title thereto was vested in the defendants by virtue of Chapter 7861 and Chapter 7891, Acts of 1919, Laws of Florida.

"Defendants say that the lands described in Deed No. 15898, generally known as the Henderson Deed, with other lands, came to the State of Florida in what is known as Everglades Patent No. 137. The said Patent was dated April 29, 1903, and was authorized by the Swamp Land Grant Act of September 28, 1850. In the said Patent, all lands to the south and west of Lake Okeechobee were bounded by the shore of the said lake.

"Defendants say that by said Everglades Patent No. 137, Sections 11 and 12, as referred to in the said bill of complaint were fractional sections and were bounded on the north and east by the shore of Lake Okeechobee.

"Defendants aver that by Deed No. 15898 as referred to in the bill of complaint, it was the expressed purpose of the defendants, and defendants did convey thereby to the heirs of Colonel John A. Henderson, for services as Selecting Agent for defendants, 98276.83 acres, estimated. The said lands, by the terms of the said deed 'embraced between the line of existing surveys and the margins of the Okeechobee and tributaries, and are more particularly designated by

what would be the projections of the existing lines of survey' as will appear by certified copy of said deed hereto attached and made a part of this answer and marked 'Defendants Exhibit B.'

"Defendants aver further that at the time of the execution of Deed No. 15898 the high water mark or shore line of Lake Okeechobee and its tributaries had been defined by what was known as the 'Keller Survey;' that the 'Keller Survey' was to all intents and purposes identical with the 'State Survey' as referred to in·the bill of complaint, and that in the execution of the said Deed No. 15898, defendants were guided by the 'Keller Survey;' as was Colonel John A. Henderson in November, 1897, when he requested that deed be executed to him to the identical lands that were executed to his heirs in the said Deed No. 15898. As exemplified by said Deed No. 15898 and the 'Keller Survey,' defendants parted with title to 627 acres in Section 11, and 325 acres in Section 12, as referred to in the bill of complaint, the North and East boundary thereof being indicated by the said 'Keller' or 'State' Survey. And the land indicated in red in the said sections and bill, and which title is here sought to be quieted in complainants, were and are North and East of the 'Keller Survey,' were not embraced in said deed, were at the time of the execution thereof a part of the bed of Lake Okeechobee, have since been reclaimed by the drainage operations of Everglades Drainage District, and are now vested in defendants by virtue of Chapter 7861 and Chapter 7891, Acts of 1919, Laws of Florida. A blueprint of the map of the 'Keller Survey,' or so much thereof as is pertinent to this case, is hereto attached, marked 'Defendants Exhibit C' and made a part of this answer. There is also included with the blueprint of the 'Keller Survey' blueprints of Township 40 South, Range 32 East; Township 41 South, Range 32 East; Township 42

South, Range 31 East, and Township 43 South, Range 31 East, which is made a part thereof for the purpose of showing all lands in Deed No. 15898.

"Deed No. 15898 covered and described lands 'lying between the limits of existing surveys and the shores of so much of Lake Okeechobee and its tributaries as are included in said surveyed lines.' The shore or high water mark of Lake Okeechobee at the time of the execution of the Deed List, Certificate and Deed No. 15898 as above was defined by the 'Keller Survey' and later by the 'State Survey.' The lands indicated in red and described in the bill of complaint never lay between the lines of existing survey and the margin or shore of Lake Okeechobee as described in the said Deed List, Certificate, and Deed No. 15898, but at the time of the execution thereof and for years after the said lands described in the said bill of complaint were a part of the bed of Lake Okeechobee, were held by the State of Florida by right of sovereignty, have in recent years been reclaimed by the drainage work of Everglades Drainage District and are now vested in defendants by the Acts of theLegislature as herein enumerated."

Testimony was taken and the chancellor decreed for the complainant.

Patent No. 137 covered swamp and overflowed lands granted to the State by Act of Congress approved September 28, 1850, one boundary pertinent in this case being "around the shores of Lake Okeechobee and along said lake."

A copy of Patent No. 137 appears on pages 457 *et seq.* of Volume 90, Florida Reports, 108 South. Rep. 191, *et seq.*

Deed No. 15,898 of *unsurveyed* swamp and overflowed lands "embraced between the line of existing surveys and the margins of the Okeechobee and tributaries, and more particularly designated by what would be the projections of

the existing lines of survey" from the State Trustees to complainant's predecessor in title, executed December 28, 1904, omitting repetition of descriptions not here involved, is as follows:

## Exhibit "B".

## "INTERNAL IMPROVEMENT FUND STATE OF FLORIDA.

Deed No. 15898.

"This indenture made this 28th day of December, A. D. 1904, by and between W. S. Jennings, Governor, A. C. Croom, Comptroller, W. V. Knott, Treasurer, W. H. Ellis, Attorney General, and B. E. McLin, Commissioner of Agriculture, as Trustees of the Internal Improvement Fund of the State of Florida, parties of the first part, and John W. Henderson and Jennie H. Murphree, of the County of Leon, State of Florida, and Flora A. Waldo, of the County of Kings, in the State of New York, children and heirs at law of John A. Henderson, deceased, formerly of the County of Leon in the State of Florida, parties of the second part.

"Whereas, it appears from the printed minutes of the Trustees of the Internal Improvement Fund of the State of Florida, valume three (3), on page 290, that the said John A. Henderson was employed by said Trustees as agent to make further selections of land granted to the State by Act of Congress of September 28th, 1850, upon the terms and conditions appearing in the recorded minutes of said Trustees, dated March 15th, 1884, and which is as follows:

"The Commissioner of Lands and Immigration having been requested to employ a suitable and competent person, as Agent of the Board, to make further selections of land granted to the State by Act of Congress, September 28th, 1850, and to procure the proof required by the regulations

of the United States Land Department for the approval of such selections, reported that he had employed Col. John A. Henderson for that purpose, and that he was to incur all the expense necessary to make the selections and proof required, and to receive as compensation for such service not exceeding two cents per acre upon the amount of such selections which may be patented to the State, and to be paid in such lands at schedule prices—which was approved by the Board.''

''And Whereas, The following order of the Board of Trustees was on November 15th, 1897, adopted and entered in the minutes of said Board which appears in the reports of the Secretary and Treasurer of the Internal Improvement Fund, between the years 1899 and 1900, to-wit:

''November 15, 1897—John A. Henderson appeared and presented an application to the Board for a settlement and adjustment of his accounts as agent of the State of Florida for the selection of swamp and overflowed lands under the Swamp Land Act of September 28th, 1850, up to the present date.

''And it appearing from the record of this Board that Mr. Henderson was employed as such agent by the Commissioner of Lands and Immigration, confirmed by resolution adopted on March 15th, 1884, at a compensation of two cents per acre upon all lands patented upon his selections, payable in any lands of the Fund according to the schedule prices for the sale of lands, which at the date of such resolution ranged from one dollar per acre for forty-acre tracts to forty-five cents per acre for lands in bodies of twenty-five thousand acres or more.

''That under such contract there has been of such selections an area of more than three million two hundred and fifty thousand acres patented to the State.

''That there is pending for confirmation an area of such

selections of unsurveyed lands or more than one million five hundred thousand acres, located in the several counties of the State, and in addition thereto a selection has been made covering unsurveyed lands adjacent to the margin of Lake Okeechobee and the Everglades, aggregating, say three million four hundred thousand acres, which are practically ready for patents.

"That under the law the compensation of such payment is payable first to such agent out of all the lands when patented, and prior to the rights of all grantees under grants, and that while compensation has been from time to time made to such agent in lands at the more recent uniform prices of one dollar per acre on patented selections, there will still be due to him and payable when patented the compensation on five to five million five hundred thousand acres of land, payable as aforesaid.

And it further appearing to the Board, that there are continuously arising between said Agent on account of his compensation, frictions with Land Grand Companies, over lands, prejudicial to the practical application of the swamp and overflowed lands to the purpose of drainage, reclamation and internal improvement, by the Board.

"And the said Henderson indicated to the Board he would accept an area of said swamp and overflowed lands that are unsurveyed and contiguous, and that are in estimated acreage of less area than the acreage he would be entitled to, even at the present prices of one dollar per acre, as compensation in full for his account for services as such agent to date, thus eliminating all questions arising therefrom and embarrassing to the further application of the lands to the purpose of the act of Internal Improvement. The lands thus to be taken are embraced between the line of existing surveys and the margins of the Okeechobee and tributaries, and are more particularly designated by what

would be the projections of the existing lines of survey, as follows:    *    *    *

"All unsurveyed Sections 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 23, 24, 25, 26, 30, 31, 32, 34, 35 and 36, T. 42 S., R. 32 E.    *    *    *

"That the Board accepts the proposition of said Agent, John A. Henderson, and therefore, it is

"Resolved, That the Commissioner of Lands and Immigration be and he is hereby directed to withdraw from sale and further disposal by this Board, and that when patented to the State, the Board will convey to the said Henderson, or to his assigns, the lands of said list as above, in full settlement of his compensation for services as State Agent for the selection of swamp and overflowed land accruing or to accrue to the State under the Act of Congress of September 28th, 1850, up to the date of this resolution.

"And Whereas, On December 21st, 1904, the following petition in behalf of the said parties of the second part was presented to the Trustees by T. L. Clarke, Attorney for Petitioners:

"To the Hon. W. S. Jennings, Governor of the State of Florida; W. V. Knott, Treasurer; W. H. Ellis, Attorney General; A. C. Croom, Comptroller, and B. E. McLin, Commissioner of Agriculture, of said State of Florida, the petition of John W. Henderson, Jennie H. Murphree and Flora A. Waldo, would respectfully show:

"That the petitioners are the children and only heirs at law of John A. Henderson, who departed this life intestate in Leon County, State of Florida, on the 9th day of August, A. D. 1904.

"That on the 15th day of November, A. D. 1897, and for a number of years prior thereto, said John A. Henderson was agent of the State of Florida for the selection of swamp and overflowed lands under the Act of September

28th, 1850, passed by Congress of United States, by appointment and contract with the Trustees of Internal Improvement fund of the State of Florida.

"That on the 15th day of November, A. D. 1897, said John A. Henderson, as such agent, presented his application to said Trustees for settlement and adjustment of his accounts for the selection of lands up to that date under his said appointment and contract aforesaid and proposed to accept in full satisfaction of his claims for such compensation certain lands embraced between the then existing surveys and the margins of the Okeechobee and tributaries containing about 98,000 acres then unsurveyed and not patented to the State.

"That the said proposition of the said Agent, John A. Henderson was then and there accepted by said Trustees and by resolution of said Trustees the said lands were withdrawn from sale and further disposal, and said Trustees resolved to convey the same to said Henderson or his assigns in full settlement of his compensation for services as State Agent for the selection of lands as aforesaid up to the date aforesaid, when said lands should be patented to the State. All of which will appear more fully by reference to the Minutes of said Trustees as appearing in their printed proceedings for the year 1897, on pages 24, 26, which are made a part of this petition as it is set out herein.

"That on the 29th day of April, 1903, the said lands were duly patented to the State of Florida and the said John A. Henderson then became entitled to a conveyance of the same by deed from said Trustees under the terms of the settlement and resolutions aforesaid, but no such conveyance was made by said Trustees to said Henderson in his life time or has since been made to his heirs or assigns.

"That petitioners as the children and only heirs at law of said John A. Henderson, deceased, are entitled by inheri-

tance to all his property including his right to a conveyance of the lands aforesaid.

"Wherefore, petitioners pray that said lands by proper description as contained in the Patents thereof be conveyed by proper deed duly executed by said Trustees of the Internal Improvement Fund of the State of Florida to your petitioners as heirs at law of said John A. Henderson, deceased.

"And will ever pray &c.

John W. Henderson,
Jennie H. Murphee.
Flora A. Waldo, by
John W. Henderson.

T. L. Clarke Attorney for Petitioners.

STATE OF FLORIDA )
LEON COUNTY.        )

"Before the undersigned authority personally appeared John W. Henderson, one of the petitioners named in the foregoing petition, who being duly sworn says that all the facts therein set forth are true as stated in said petition.

John W. Henderson.

Sworn to and subscribed before    )
me this December 21st, A. D. 1904.  )
    Nellie E. Bassett.             )
Notary Public, State Fla.             )
Com. expires Aug. 1907.               )
    (SEAL)                        )

"And Whereas, It appears that the said John A. Henderson departed this life intestate in Leon County, State of Florida, on the 9th day of August, A. D. 1904,

and that the said parties of the second part are the children and only heirs at law of the said John A. Henderson, deceased, and as such are entitled to the benefits and advantages which accrued to the said John A. Henderson, in his life time by virtue of the settlement between him, as agent of the State for the selection of swamp and overflowed lands under the Act of Congress September 28th, 1850. And the Board of Trustees of the Internal Improvement Fund of the State of Florida on November 15th, A. D. 1897, as the said Board was then constituted.

"And Whereas, The said lands hereinbefore described have recently been patented to the State of Florida,

"NOW THEREFORE, THIS INDENTURE WITNESSETH:

"That the said Trustees of the Internal Improvement Fund of the State of Florida, hereinbefore designated as parties of the first part to this indenture, in consideration of the premises and in order to carry out the settlement heretofore made between the said John A. Henderson, as agent of the State aforesaid, and the Trustees of the Internal Improvement Fund of the State of Florida, on the 15th day of November, A. D. 1897, hereinbefore referred to and pursuant to a resolution of the said Trustees this day adopted and entered upon the minutes of the said Trustees, and in consideration of a receipt in full to date executed by said parties of the second part to said Trustees for all claims and demands of whatsoever nature or kind which the estate or heirs of the said John A. Henderson, deceased, may have against the said Trustees of the Internal Improvement Fund of the State of Florida on account of services performed by the said John A. Henderson, in his life time, his agents or employees, as Agent of the State for the selection of Swamp and Overflowed lands under the Act of Congress of September 28th, 1850, and under the provisions of Section 429 of the Revised Statutes of Florida,

and for and in consideration of the sum of One Dollar ($1.00) to the said parties of the first part, in hand paid by the said parties of the scond part, the receipt whereof is hereby acknowledged, the said parties of the first part have given, granted, bargained and sold, and by these presents do give, grant bargain, sell and convey unto the said parties of the second part, their heirs and assigns, forever, the following described lands, to-wit:

"All unsurveyed fractional SE ¼ Section 32 and S ½ Section 33, T. 40 S. R. 32 E.

"All unsurveyed Sections 3, 4, 5, 8, 9, 10, 15, 17, 21, 27, 28, 31, 32, 33, and 34, T. 41 S., R. 32 E.

"All unsurveyed sections 19, 20, 21, 24, 25, 26, 27, 28, 29, 30, 32, and 33, T. 42 S., R. 30 E.

"All unsurveyed Sections 1, 11, 12, 13, 14, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 34, 35 and 36, T. 42 S. R. 31 E.

"All unsurveyed Sections 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 30, 31, 32, 34, 35 and 36, T. 42 S., R. 32 E.

"All unsurveyed Sections 7, 13, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35 and 36, T. 42 S., R. 33 E.

"All unsurveyed Sections 19, 30, 31 and 32, T. 42 S., R. 34 E.

"All unsurveyed Sections 1, 2, 3, 10, 11, 12, 13, 14 E. ½ and E. ½ of W. ½ of Section 15; E. ½, E. ½ of N.W. ¼ of Section 22; all Sections 23, 24, 25, 26; E. ½ of Section 27; N.E. ¼ of Section 34; N. ½ of Section 35; and N. ½ of Section 36, T. 43 S., R. 31 E.

"All unsurveyed Sections 1, 2, 3, 4. 5, 6, 7; 8, 9, 10, 11, 12, 13, 14, N ½ and N.E. ¼ of Section 15; all Sections 17, 18 and 24, 25 and 36, T. 43 S., R. 32 E.

"All unsurveyed Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35 and 36, T. 43 S., R. 33 E.

"All unsurveyed Sections 7, 8, 9, 10, 15, 17, 18, 19, 20, 21, 22, 27, 28, 29, 30, 31, 32, 33 and 34, T. 43 S., R. 34 E.

"All unsurveyed Sections 1, 2, 3, 4, 5 and 6, T. 44 S., R. 33 E.

"All unsurveyed Sections 3, 4, 5 and 6, T. 44 S., R. 34 E.

"Containing an estimated area of 98,276.83 acres, lying and being in the counties of DeSoto and Lee, in the State of Florida.

"TO HAVE AND TO HOLD the above granted and described premises unto the said parties of the second part, their heirs and assigns forever.

"SAVING AND RESERVING unto the said, the Trustees of the Internal Improvement Fund of the State of Florida, and their successors, the right at any time to enter upon the said land and make or cause to be made and constructed thereon such canals, cuts, sluiceways, dikes and other work as may, in the judgment of the said Trustees, or their successors, be necessary and needful for the drainage and reclamation of any of the lands granted to the State of Florida by Act of Congress, approved September 28th, 1850, and to take from the said lands hereby conveyed, and to use such gravel, stone or earth as may in the judgment of the said Trustees, or their successors, be necessary to use in the making and construction of said canals, cuts, sluiceways, dikes and other works upon said lands for the purposes aforesaid.

"IN TESTIMONY WHEREOF, The said Trustees have hereunto subscribed their names and affixed their seals, and have caused the seal of 'THE DEPARTMENT OF AGRICULTURE OF THE STATE OF FLORIDA' to be hereunto affixed, at the Capitol, in the City of Talla-

hassee, on this the 28th day of December, A. D. Nineteen
Hundred and Four.

    W. S. JENNINGS,     (SEAL)
     Governor.
    A. C. CROOM,     (SEAL)
     Comptroller.
    W. V. KNOTT,     (SEAL)
     Treasurer.
    W. H. ELLIS,     (SEAL)
     Attorney General.
    B. E. McLIN,     (SEAL)
     Commissioner of Agriculture.''

A survey made subsequent to December 28, 1904, when
Deed No. 15,898 was executed, disclosed that Sections 11
and 12, T. 42 S., R. 32 E. are fractional sections bordering
on the shore and waters of Lake Okeechobee, a navigable
lake. The land in controversy is on the southwest side of
Lake Okeechobee, a navigable lake, between the meander
line of the navigable lake surveyed under State authority
after the conveyance by trustees in 1904, and the waters
of the lake at the time this suit was brought. The lands
conveyed by Deed No. 15,898 were *unsurveyed* lands, and
were to be located by a contemplated official survey.
Hardee v. Morton, 90 Fla. 452, 108 South. Rep. 189;
Seminole Fruit & Land Co. v. Pyles, 13 Fed. Rep. (2d)
878; Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75,
87 South. Rep. 68.

Volume 12 of the printed minutes of the Trustees of
the Internal Improvement Fund of the State of Florida
at page 65, contains the following, of which the Court
takes judicial notice (Byrne Realty Co. v. South Florida
Farms Co., 81 Fla. 805, text 837):

''The Chief Drainage Engineer stated that the meander
line of Lake Okeechobee as heretofore surveyed covered

only a portion of the south and eastern shores of the lake, and in view of the rapid development and occupation of lands along the lake shore by settlers requiring the establishment of lakeside boundaries of lands, that it would be advisable to complete the meander of the shore of Lake Okeechobee entirely around the Lake at an early date.

"Mr. Amos moved that the Trustees have said meander line surveyed so as to complete the meander of Lake Okeechobee. The motion was duly seconded and unanimously adopted, whereupon the Chief Drainage Engineer was directed to proceed with the meander of the said lake at the earliest practicable date."

Pursuant to this authority the Trustees required that in the official survey "the lands lying along Lake Okeechobee shall have their lake side boundaries determined and established by a line run substantially along the high water mark of said lake, and said lake side boundary line or meander line shall have such courses as will cause the said line to be parallel to and conform as nearly as may be to the direction of the said high water mark, and the areas of lands, lots, fractional sections, etc., lying along the lake, will have their areas computed on the basis of this—together with the other boundary lines thereof." This clearly shows that the purpose of the official survey was to locate and establish the line of ordinary high water mark of the navigable lake; and the survey thus ordered and made included a meander line of the true ordinary high water mark of the navigable lake where the lands here in controversy are located.

The accuracy of the State survey of the water line of the lake was not directly challenged. The State Engineer testified that in 1911 the area in controversy "was all covered by the waters of Lake Okeechobee, under ordinary normal

560     SUPREME COURT OF FLORIDA.

John W. Martin, Governor, et al. v. C. M. Busch et al.—Statement of Case.

conditions''; that ''there are marks and monuments still in existence by which you could testify to the ordinary water mark of the lake prior to the drainage operations'' and that ''the old rim of the lake or the line at which the water of the lake usually stood before affected by the drainage operations of the State, were then and are still indicated by lines of trees growing about high water mark, especially the cypress trees growing on the shore of the lake; also by the more pronounced slope at the margin of the lake, where the level lands of the Everglades sloped through the shore to the bottom of the lake forming the marginal line between the flats of the lake bottom and the level lands of the Everglades, and also by the change of character of soil, which formed the land of the Everglades above the water of the lake, which soil was usually muck and the soil forming the shore and bottom of the lake, which soil was usually sand''; that the State survey of the water line of the lake ''was established for the purpose of marking as nearly as practicable the line of the lake at ordinary water level or for showing the original shore of the lake.''

There was other testimony that the lands in controversy had been a part of the bottom of the waters of the lake.

There is testimony that the slope of the land towards the present waters of the lake from the water line located by the State survey is very slight; and that vegetation flourishes on the lake side of the State survey.

Since the conveyance made by Deed No. 15,898, in 1904, the waters of the lake have receeded because of drainage operations conducted under State authority.

The ''Keller Survey'' referred to in the answer was not an approved official survey. It purported to meander the navigable lake and to ascertain or estimate the contents of the fractional sections of Township 42 South,

Range 32 East. The northeast corner of the township intersects with the lake showing no Section 1 and making Sections 2, 3, 11 and 12 of the township fractional sections terminating at the meander line of Lake Okeechobee. The lands on the land side of the high water mark of the lake are swamp and overflowed lands granted to the State by Act of Congress, September 28, 1850, and patented to the State in 1903 by Patent No. 137, such lands being by statute vested in the State Trustees for the purpose stated in the statutes. The lands on the lake side of the high water mark of the navigable lake belong to the State by virtue of its sovereignty attained upon being admitted into the Union by Act of Congress approved March 3, 1845.

The Keller Survey contemplates 640 acres to the full sections of the township as required by law.

The difference between the Keller map and the Frederick map of the section line in the township is apparently. caused by the method in which the Frederick survey of the section lines was made. On the Frederick map, the north line of Section 6 is 87.69 chains instead of 80 chains, which makes the west line of Section 5 and others south of it further east than it should be, thereby making a large excess acreage appear in Sections 6, 7 and 18 and a diminished acreage in fractional Sections 2, 3, 11 and 12.

The Frederick survey is appellee's private survey of Township 42 South, Range 32 East. It does not make the full sections of the township contain 640 acres each. The section lines are so run that the west lines of the eastern tiers of sections are further east than they should be, which makes some of the sections contain more than 640 acres each and makes the fractional Sections 11 and 12 bordering on the lake, appear to contain less acres than was estimated in the conveyance made by the State Trustees in Deed No. 15,898. The township as shown by the Frederick

map apparently contains more acreage than was estimated in the list of lands described in Deed No. 15,898; and apparently if the section lines of the township were run as required by law, Sections 11 and 12 abutting on the lake would contain approximately the acreage shown by the Keller survey and as estimated in the lists of lands that are described by sections, townships and ranges in Deed No. 15,898.

WHITFIELD, P. J. (*after stating the facts.*)—This appeal is from a decree adjudicating lands below the officially located line of high-water mark of Lake Okeechobee, a navigable non-tidal lake in this State, belong to complainant, appellee here, who claims under a conveyance of unsurveyed swamp and overflowed lands granted to the State by Act of Congress, approved September 28, 1850, the defendants being State Trustees who had no authority to convey lands under navigable waters when in 1904 they conveyed unsurveyed swamp and overflowed lands to complainant's predecessors in title; but such State Trustees now claim title to the lands in controversy by virtue of Chapters 7861 and 7891, Acts of 1919.

When in July, 1821, the United States took possession of "all the territories  *  *  *  known by the name of East and West Florida," and "the adjacent islands" that were ceded by Spain and afterwards incorporated into the Territory of Florida, the laws of the United States became applicable and the United States took and held the lands under the navigable waters, including the shores or spaces between ordinary high and low water marks and tide lands, for the use and benefit of the State that was to be subsequently formed with rights of sovereignty.   Such lands were not granted by the United States while Florida was a Territory.   Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. Rep.

548; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; Apalachicola Land and Development Co. v. McRae, 86 Fla. 393, 98 South. Rep. 505; Illinois Steel Co. v. Bilot, 109 Wis. 418, 85 N. W. Rep. 402, 83 Am. St. Rep. 905; Goodtitle v. Kibbe, 9 How. (U. S.) 471; United States v. Holt State Bank, 270 U. S. 49, —Sup. Ct. Rep. —.

Upon the admission of Florida into the Union by Act of Congress of March 3, 1845, the State, by virtue of its sovereignty, became the owner of all lands under the navigable waters within the State, including the shores or spaces if any between ordinary low water mark and ordinary high water mark, and also all tide lands, *viz.*, lands covered and uncovered by the daily ebb and flow of normal tides. Pollard v. Hagan, 3 How. (U. S.) 212. Such lands under navigable waters to ordinary high water mark and tide lands may for convenience be designated as sovereignty lands, since they belong to the State by virtue of its sovereignty in consequence of becoming a State in 1845. Illinois Steel Co. v. Bilot, *supra.* The navigable waters include lakes, rivers, bays or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or elsewhere, or whether the waters are navigable during the entire year or not. See Bucki v. Cone, 25 Fla. 1, 6 South. Rep. 160; Economy Light & Power Co. v. United States, 256 U. S. 113, 41 Sup. Ct. Rep. 409; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; People v. New York & O. P. Co., 219 N. Y. Supp. 497; State v. Korrer, 127 Minn. 60, 148 N. W. Rep. 617, L. R. A. 1916C 139; 23 A. L. R. 757, Notes.

In 1845 the State by virtue of its sovereignty upon being admitted to the Union became the owner of, and unless lawfully conveyed or granted, still owns the beds of all navigable lakes to ordinary high water mark, however shal-

low the water may be at the outside lines or elsewhere if the water is in fact a part of the particular lake that is navigable for useful purposes. See Illinois Steel Co. v. Bilot, *supra*. In flat territory or because of peculiar conditions, there may be little if any shore to navigable waters, or the elevation may be slight and the water at the outer edges may be shallow and affected by vegetable growth or other conditions, and the line of ordinary high water mark may be difficult of accurate ascertainment; but when the duty of determining the line of high water mark is imposed or assumed the best evidence attainable and the best methods available should be utilized in determining and establishing the line of true ordinary high water mark, whether it is done by general or special meandering or by particular surveys of adjacent land. Marks upon the ground or upon local objects that are more or less permanent may be considered in connection with competent testimony and other evidence in determining the true line of ordinary high water mark. When the line of ordinary high water mark is duly ascertained and established by competent authority, such line should be regarded as the true line unless duly impeached for fraud or mistake.

The descriptions given in the bill of complaint show that the lands in controversy are below the lines of the "State Survey." Such survey is of the water line of Lake Okeechobee, a navigable body of water, the lands below ordinary high water mark of the navigable lake being State sovereignty lands, while the lands above such high water mark are swamp and overflowed lands.

Where lands below high water mark of navigable bodies of water are claimed, the right thereto should be specifically shown, since such ownership is exceptional. See Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; Symmes v.

Prairie Pebble Phosphate Co., 64 Fla. 480, 60 South. Rep. 223.

In suits for the removal of clouds from title as a general rule, an allegation in the bill that complainant is the owner in fee of the lands in question, and in the actual possession thereof, or that the lands are wild, unimproved, or unoccupied, if such be the case, is sufficient, without setting out in detail the facts showing such ownership, as ownership is the ultimate fact and the others are mere evidentiary facts. If, however, in addition to an allegation of ownership in fee, the facts which constitute the title, of whatever nature they may be, are also set out, and such facts show title not to be in the complainant, a demurrer to the bill will lie. Brickell v. Trammell, 77 Fla. 544, 82 South. Rep. 221; Florida Chancery Juris., p. 214.

While ordinarily a meander line is not necessarily a boundary line when conveyances do not expressly make the meander line one of the calls of the boundary (Lord v. Curry, 71 Fla. 68, 71 South. Rep. 21) yet where a meander line is run under State authority for the purpose of identifying, locating and establishing the true line of ordinary high water mark of a body of navigable water, and the lands below high water mark are sovereignty lands and the lands above high water mark are swamp and overflowed lands or other uplands subject to ordinary private ownership, in such case the meander line, if so intended and if duly and fairly ascertained and established, becomes, and, unless duly impeached, continues to be, a boundary line limiting the extent of conveyances of the adjacent uplands or of permissible grants or conveyances of the sovereignty lands below ordinary high water mark.

The description in the Patent No. 137 issued in 1903, to the State under the Swamp and Overflowed Land Grant Act of Congress of September 28, 1850, as to the northern

boundary of fractional Township 42 S., Range 32 East, is "around the shores of Lake Okeechobee and northerly along said lake." This has reference to the ordinary high water mark of the navigable lake, since the State by virtue of its sovereignty owned the land below ordinary high water mark and the grant of swamp and overflowed lands in 1850, could not and did not include any lands that had become the property of the State in consequence of the Act of 1845 admitting Florida into the Union as a sovereign State "on equal footing with the original States, in all respects whatsoever." See Revised General Statutes, 1920, page 263; State ex rel. Kittel v. Jennings, 47 Fla. 307, 35 South. Rep. 986; South Florida Farms Co. v. Goodno, 84 Fla. 532, text 549, 94 South. Rep. 672; Scott v. Lattig, 227 U. S. 229, 33 Sup. Ct. Rep. 242; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826. See also Lee Wilson & Co. v. United States, 245 U. S. 24, 38 Sup. Ct. Rep. 21; 46 Sup. Ct. Rep. 569; 218 N. Y. 459; 113 N. E. 521; Anna. Cas. 1918B, 109 Notes.

Lake Okeechobee, being a navigable lake, the bed of the lake including the shores between ordinary high and low water marks, belonged to the State by virtue of its sovereignty upon the admission of the State into the Union by the Act of March 3, 1845, and such bed of the lake is not included in the grant of September 28, 1850, of swamp and overflowed lands, therefore the lands covered by the Patent No. 137 extended only to ordinary high water mark around the navigable lake. Illinois Steel Co. v. Bilot, supra; Broward v. Mabry, supra.

The conveyance by the State Trustees in 1904 to appellee's predecessor in title was of unsurveyed swamp and overflowed lands and embraced "all unsurveyed sections * * * 11 and 12 * * * T. 42 S. R. 32 E." Such conveyance contemplated a survey of the lands by State

authority. Hardee v. Horton, 90 Fla. 452, 108 South. Rep. 189; Everglades Sugar & Land Co. v. Bryan, 81 Fla. 75, 87 South. Rep. 68. Even if before the official meander line was run in 1917-1918 the complainants assumed to exercise ownership rights in the land that had been below high water mark and on the lake side of the meander line as subsequently run, such exercise of asserted ownership rights does not give complainants any right or title to sovereignty lands that were actually below high water mark of the navigable lake. The State Trustees had no authority in 1904 to convey sovereignty lands below high water mark on the navigable lake, and did not attempt to do so.

Drainage operations of the State caused the waters of the navigable lake to recede owing to the lowering of the level of the lake, and an official meander line run in 1917-1918 showed the lands in controversy to be between the former ordinary high water mark and the present waters of the lake; but as such lands were sovereignty lands when covered by the waters of the navigable lake, they remained sovereignty lands when the water receded. Such lands on the lake side of the meander line, which meander line was shown by the weight of the evidence to be the line of the former ordinary high water mark of the lake, were not included in the conveyance by the State Trustees, since the lands were sovereignty lands not covered by the grant of swamp and overflowed lands or by the patent to the State made pursuant to the Congressional grant, and the trustees then had no authority to convey such sovereignty lands. State ex rel. Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353; Broward v. Mabry, *supra*.

Conveyances of uplands including swamp and over-flowed lands do not include sovereignty lands below the ordinary high water mark of lands under navigable

waters, unless authority and intent to include such sovereignty lands clearly appear. In McDade v. Bossier Levee Board, 109 La. 625, 33 South. Rep. 628, relied on by appellee, the lake was not navigable and the State regarded the lands as being swamp and overflowed lands. See later case State *ex rel.* Board of Com'rs of Atchafalaya Basin Levee Dist. v. Capdeville, 146 La. 94, 83 South. Rep. 421.

When the State through its authorized agency, makes sales or conveyances of unsurveyed lands bordering on the shores of navigable waters, it is the duty of the State to officially determine the limits and existing boundaries of the sovereignty lands under navigable waters on which the sold or conveyed lands border; and when such boundaries are duly established, sales or conveyances of adjacent lands are to be regarded as made with intent that such sales and conveyances shall and do conform to the boundary lines thus established between the sovereignty lands held by virtue of the Act of March 3, 1845, and the swamp and overflowed land acquired by the State under the Congressional Act of September 28, 1850, or other lands that may border on sovereignty lands. Uplands are those bordering on bodies of waters.

Lands bordering on the shores of a navigable lake or other navigable body of water may be swamp and overflowed lands within the meaning of the Swamp and Overflowed Land Grant Act of Congress of September 28, 1850; but such swamp and overflowed lands do not extend beyond the ordinary high water mark of navigable lakes or other bodies of navigable water, since lands under navigable waters to ordinary high water mark became the property of the State by virtue of its sovereignty attained when admitted into the Union as a State under the Act of Congress, March 3, 1845. There are no tide lands ad-

VOL. 93, JANUARY TERM, 1927.        569

John W. Martin, Governor, et al. v. C. M. Busch et al.—Opinion of Court.

jacent to the navigable waters here as there were in City of Tarpon Springs v. Smith, 81 Fla. 479, 88 South. Rep. 613; Clement v. Watson, 63 Fla. 109, 58 South. Rep. 25; Lord v. Curry, 71 Fla. 68, 71 South. Rep. 21.

When the sovereignty lands acquired or owned by the State of Florida in consequence of the Act of Congress of March 3, 1845, admitting Florida into the Union, are duly identified and located by an authorized survey and determination of the line of ordinary high water mark, such survey determined at least *prima facie* the boundary line of prior or subsequent conveyances by the State Trustees of unsurveyed swamp and overflowed lands or other lands bordering on the navigable waters or its shores, unless by competent authority and by an intent duly expressed or implied by due course of law, the conveyances in law and in fact extend to or cover land below the ordinary high water mark of the navigable water; and this is so whether the true water line is established before or after a conveyance of the adjoining lands.

If by mistake or otherwise sales or conveyances are made by the Trustees of the Internal Improvement Fund of sovereignty lands, such as lands under navigable waters in the State or tide lands, or if such Trustees make sales and conveyances of State School lands, as and for swamp and overflowed lands under the authority given such Trustees to convey swamp and overflowed lands, such sales and conveyances are ineffectual for lack of authority from the State. See Illinois Steel Co. v. Bilot, *supra;* State *ex rel.* v. Jennings, 47 Fla. 307, 35 South. Rep. 986; Broward v. Mabry, 58 Fla. 398, 50 South. Rep. 826; State *ex rel.* Ellis v. Gerbing, 56 Fla. 603, 47 South. Rep. 353. The authority given the Trustees of the Internal Improvement Fund by the Acts of 1919, Chapters 7861 and 7891, or

other similar Acts, is not considered here because not involved.

Where sales and conveyances of *unsurveyed* swamp and overflowed lands are made by the Trustees·of the Internal Improvement Fund, it is the duty of the State to survey the lands intended to be conveyed so that the location and boundaries thereof may be identified and established. Hardee v. Horton, 90 Fla. 452, 108 South. Rep. 189. A conveyance of all of an unsurveyed fractional township or section of swamp and overflowed lands which borders on a navigable lake or other body of navigable water, carries title to the true line of ordinary high water mark that has been or that should thereafter be legally established; and if the acreage stated in the conveyance of swamp and overflowed lands is less than the true acreage outside of the true line of ordinary high water mark of the adjacent navigable water, such deficit does not authorize an extension or contraction of the true water line or give the grantee any sovereignty land within or on the lower or lake side of the true water line. The grantee takes with notice that the conveyance of swamp and overflowed land does not in law cover any sovereignty lands and that the Trustees of the swamp and overflowed lands as such have no authority to convey sovereignty lands. The authority of the Trustees as to submerged lands under the Acts of 1919 and other Acts, is not involved here.

The conveyance of December 28, 1904, by the Trustees of the Internal Improvement Fund to the predecessors in title of complainants covered an "estimated acreage" of *unsurveyed* lands "embraced between the line of existing surveys and the margins of the Okeechobee and tributaries, and more particularly designated by what would be the projections of the existing lines of survey as follows: * * *

All unsurveyed sections    *    *    *    11, 12    *    *    *    T. 43
S., R. 32 E.''

When the Trustees of the Internal Improvement Fund
made the conveyance to the predecessors of complainants
in 1904, such Trustees had authority to convey the swamp
and overflowed lands of the State; but they had no author-
ity to convey sovereignty lands under navigable waters or
the shores below ordinary high water mark of navigable
waters or tide lands.    Broward v. Mabry, *supra;* Illinois
Steel Co. v. Bilot, *supra.*

The authority given such Trustees by Chapters 7861,
7891, Acts of 1919, with reference to submerged and marsh
lands was subsequent to the conveyance of unsurveyed
swamp and overflowed lands by the State Trustees to
complainants' predecessors in title in 1904; and any
authority that may be conferred by the Acts of 1919, does
not operate to convey or confirm title to lands not covered
by the conveyance in 1904.    The authority of the Trustees
as to the swamp and overflowed lands granted to the
State by the Act of Congress of September 28, 1850, and
as to the submerged and marsh land that belong to the
State by virtue of sovereignty, are separate and distinct
trusts and powers conferred for different purposes by
statutes enacted many years apart, the principal statute as
to the swamp and overflowed lands (Chapter 610) having
been enacted in December, 1855, and approved January,
1856, and the statutes giving authority as to submerged
and marsh lands were enacted in 1919.

The only purpose for which the official survey of the
meander line was authorized and made under State author-
ity in 1917-1918, was to ascertain and determine and locate
and establish by State authority the line of ordinary high
water mark of the navigable lake, so that the true dividing
line between the sovereignty lands under the waters of the

lake to ordinary high water mark and the adjacent swamp and overflowed lands could be known and observed in locating the boundaries of unsurveyed land on the margin of the lake. Presumably the official meander line as established is the true ordinary high water mark of the navigable lake. This being so and the correctness of the official meander line as the true ordinary high water mark of the navigable lake dividing sovereignty lands and swamp and overflowed lands not being impeached by the evidence in this case, but confirmed by such evidence, it must stand as the true line of the ordinary high water mark of the navigable lake. The State Trustees in 1904 had no authority to convey sovereignty lands below high water mark of the lake, therefore the conveyance to complainants' predecessor in title is, by law as well as by the intendments of its terms, limited to the line of the ordinary high water mark of the navigable lake to be established by competent authority as contemplated by the conveyance as made.

The dividing line was officially established in 1917-18, and has not been impeached. The complainants' claim to lands on the lake side of the dividing line under a conveyance of swamp and overflowed lands is without foundation in law or in fact, such lands being the property of the State that could not have been conveyed and were not attempted to be conveyed by the State Trustees when they conveyed unsurveyed swamp and overflowed lands to complainants' predecessors in title in 1904. The power of the State by appropriate legislative action to lower the level of the waters in the lake or by drainage canals, dikes or otherwise, to contract the boundaries of the navigable lake and to make proper disposition of the lands that had been below high water mark, is not involved here. The complainants show title to swamp and overflowed lands only, and the lands in controversy were and are not swamp and overflowed lands,

but sovereignty lands to which the complainant has shown no title or right.

The averment in the answer that ''under the laws of this State the title to said lands (here in controversy) is vested in the defendants and held by them in trust for the people of the State of Florida,'' must be considered in connection with the statute. Chapter 7861 and 7891, Acts of 1919, vesting in the Trustees of the Internal Improvement Fund of the State, the title to certain reclaimed lands belonging to the State that are not included in the grant to the State of swamp and overflowed lands by Act of Congress of September 28, 1850. Such averment cannot change the nature of the several distinct trusts in separate classes of State lands under different statutes. The State Trustee defendants cannot by allegation, averment or admission in pleadings or otherwise affect the legal status of or the State's title to sovereignty, swamp and overflowed or other lands held by the Trustees under different statutes for distinct and definite State purposes. The State Trustees had no authority in 1904 to convey sovereignty lands, and by their conveyance in this case did not attempt or purport or intend to include any sovereignty or other lands except the unsurveyed swamp and overflowed lands described in the conveyance, which swamp and overflowed lands by law and by the intendment of the conveyance did not extend below ordinary high water mark of the navigable lake. The subsequent vesting of title to sovereignty lands in the Trustees for State purposes under the Acts of 1919 or other statutes, does not make the title to sovereignty land inure to claimants under a previous conveyance of swamp and overflowed lands by the State Trustees who then had no authority to convey such sovereignty lands and did not attempt or intend to convey sovereignty lands.

A riparian owner is one who owns to the line of ordinary high water mark on navigable waters.

Riparian owners in this State usually have title to ordinary high water mark of navigable waters; the lands below such mark belong to the State by virtue of its sovereignty, and are not held for ordinary private ownership purposes.

If to serve a public purpose the State, with the consent of the Federal authority, lowers the level of navigable waters so as to make the water recede and uncover lands below the original high water mark, the lands so uncovered below such high water mark, continue to belong to the State. Reliction is the term applied to land that has been covered by water, but which has become uncovered by the imperceptible recession of the water.

The doctrine of reliction is applicable where from natural causes water recedes by imperceptible degrees, and does not apply where land is reclaimed by governmental agencies as by drainage operations. 29 Cyc. 354; see Baumhart v. McClure, — Ohio —, 153 N. E. Rep. 211.

The Riparian Acts of 1856 and 1921 apply only to ''any navigable stream, bay or the sea or harbor.'' The latter statute by express provision does not ''apply to lakes, except tide water lakes,'' and Lake Okeechobee is not a tide water lake. Sec. 6, Chapter 8537.

Chapter 7892, Acts of 1919, validated all land surveys approved by the Chief Drainage Engineer for the Trustees of the Internal Improvement Fund, and does not validate any other surveys. The authority given by the Trustees to survey the line of high water mark of the navigable lake and the survey made must be held to mean ordinary high water mark in the absence of a contrary showing.

The answer avers ''that at the time of the execution of Deed No. 15898 the high water mark or shore line of Lake

Okeechobee and its tributaries had been defined by what
was known as the "Keller Survey"; that the "Keller Sur-
vey" was to all intents and purposes identical with the
"State Survey" as referred to in the bill of complaint,
and that in the execution of the said Deed No. 15898,
defendants were guided by the "Keller Survey," as was
Colonel John A. Henderson in November, 1897, when he
requested that deed be executed to him to the identical
lands that were executed to the heirs in the said Deed No.
15898. As exemplified by said Deed No. 15898 and the
"Keller Survey," defendants parted with title to 627
acres in Section 11, and 325 acres in Section 12, as referred
to in the bill of complaint, the North and East boundary
thereof being indicated by the said "Keller" or "State"
Survey. The Keller Survey was a private survey not bind-
ing on the State. See Mackay v. Dillon, 4 How. (U. S.) 421;
22 R. C. L. 282.

The above averments cannot avail the complainants be-
cause (1) the conveyance from the State Trustees to the
heirs of Col. John A. Henderson, complainant's predeces-
sors in title, covered only an estimated acreage of un-
surveyed swamp and overflowed lands between the line of
existing surveys and the margins of the lake, which con-
veyance did not purport to convey any lands below ordin-
ary high water mark of the navigable lake; (2) the State
Trustees then had no authority to convey sovereignty lands
below high water mark of the navigable lake, and did not
attempt to do so; (3) the swamp and overflowed lands
covered by the conveyance from the State Trustees did
not extend below ordinary high water mark of the navig-
able lake; (4) the averments of the State Trustee defend-
ants are not binding on the State as to sovereignty lands
below ordinary high water mark of the navigable lake
since such trustees in 1904 had no authority to convey

such lands (McDade v. Bossier Levee Board, *supra*) ; (5) the averments of the answer cannot vary the terms of the conveyance by the State Trustees and cannot affect the legal status of the sovereignty lands that were not included and could not lawfully be included in or covered by the conveyance of swamp and overflowed lands made by the State Trustees to complainant's predecessor in title; (6) the conveyance by the State Trustees contemplated an authorized official survey of the unsurveyed swamp and overflowed lands covered by the conveyance; (7) the Keller Survey was not an authorized official survey of the line of ordinary high water mark of the navigable lake, and it could not affect the legal character or status of the sovereignty lands below ordinary high water mark or the swamp and overflowed lands above ordinary high water mark of the navigable lake, which line of high water mark the law and the conveyance by the State Trustees contemplated should be established by an authorized official survey; (8) the Keller Survey was merely a means utilized to estimate the approximate acreage that was intended to be conveyed as unsurveyed swamp and overflowed lands between the line of existing surveys and the margins of the lake, at which margins or ordinary high water mark of the navigable lake, the unsurveyed swamp and overflowed lands terminated and the sovereignty lands of the State began; (9) the Keller Survey was approximately correct, since in making the conveyance of an estimated acreage the estimated acreage in fractional Township 42, S., R. 32 East was 14,833.79 acres, excluding Sections 16, 27, 28, 29 and 33, and an estimate from a survey shows 15,002 acres in the fractional township, exclusive of the Sections 16, 27, 28, 29 and 33. The fractional township is caused by the waters of the lake. If the sectional survey of the fractional Township 42 S., R. 32 East as made by estimation

from measurements on the map, shows 564 acres instead
of 627 acres in fractional Section 11, and 289 acres instead
of 325 acres in fractional Section 12, as claimed by con-
plainant, it is apparently because the unofficial survey of
the township was so made that the full sections west of
Sections 11 and 12 contain more than 640 acres each; for
example, Section 6 contains 696 acres; Section 7 contains
686 acres, and Section 18 contains 676 acres, and Section
19 contains 262 acres when it was estimated as 311 acres;
all of which show that the estimated acreage conveyed was
less than the actual acreage, but approximately correct,
and that the grantees of the State Trustees received all
the lands intended to be conveyed, and even more, whether
considered in connection with or without reference to the
Keller Survey.

Reversed.

STRUM AND BROWN, J. J., AND LOVE, CAMPBELL AND
KOONCE, Circuit Judges, concur.

ELLIS, C. J., AND TERRELL AND BUFORD, J. J., disqualified.

BROWN, J., Concurring:

To my mind, the controlling question in this case is the
location of the line of ordinary high water mark of Lake
Okeechobee at the time the deed was made by the Trustees
of the Internal Improvement Fund to the Henderson heirs,
in 1904. All of the land north and east of that line consti-
tuted lake bottom, or sovereignty lands, the title to which
was in the State. The deed to the Hendersons must be
construed as carrying title up to such ordinary high water
mark. The lake was a natural monument, and, as a boun-
dary, it could not be changed by a subsequent survey. It

19—Vol. 93.

constituted a legal boundary without a survey. Therefore, as between the parties to this suit the survey made by Chief Drainage Engineer. Elliott in 1917-1918, was not conclusive; at best it was only *prima facie* evidence of the location of such line. However, I am of the opinion that the weight of the evidence in this case showed that such ''State Survey Line'' was substantially correct, and that the lands described in the bill were therefore sovereignty lands, and that the decree of the Court below should be reversed. The fact that these lands were, subsequent to the Henderson deed, uncovered and reclaimed by the lowering of the lake level by artificial drainage conducted by the State could not change the title to such lands, which remained in the State just as it was when covered by the lake. The riparian rights doctrine of accretion and reliction does not apply to such lands. 1 Farnham on Waters, Sec. 69; Noyes v. Collins, 92 Iowa 566, 26 L. R. A. 609. There is, therefore, no question of riparian rights involved in this case. It is merely a question of boundary, and the law is well settled that private title to land extends no further than ordinary high water mark, and that land does not pass as an appurtenant to land. Inasmuch as the weight of the. evidence shows that this land was beyond, and outside of, the ordinary high water mark of the lake before the drainage operations were undertaken by the State, it follows that the complainants were not entitled to the relief prayed for.