178 So.2d 900 (1965)
R.E. PADGETT, Sr., et al., Appellants,
v.
CENTRAL AND SOUTHERN FLORIDA FLOOD CONTROL DISTRICT, a Florida corporation, Appellee.
No. 5276.
District Court of Appeal of Florida. Second District.
October 7, 1965.
*901 Ray M. Watson, Miami, and Julian D. Clarkson, of Henderson, Franklin, Starnes & Holt, Ft. Myers, for appellants.
Robert Grafton, Thomas J. Schwartz and William C. White, West Palm Beach, for appellee.
SMITH, Judge.
The appellee-plaintiff, Flood Control District, brought suit seeking a declaratory decree determining whether or not its construction of a levee on the shore of Lake Okeechobee constituted a taking of any property rights of the appellants-defendants, Padgetts. By their answer the Padgetts joined in this request and prayed for compensation and damages or in the alternative that the District be required to construct a lock through the levee which would afford access between the Padgett lands and Lake Okeechobee. Upon the admittedly uncontroverted facts the chancellor entered a summary final decree in favor of the District. We find no error and affirm.
All of the District's lands on which it is building a levee along a portion of the northwest shore of Lake Okeechobee was formerly covered by the lake. Parts of the Padgett lands were originally covered by Lake Okeechobee. All was reclaimed by artificial drainage and each originally was acquired from the Trustees of the Internal Improvement Fund. The levee is not located upon the land owned by the Padgetts but it is located upon former bottom lands of Lake Okeechobee located between the Padgett lands and the present waters of Lake Okeechobee so that the levee does obstruct their view of and access to the lake.
The Trustees conveyed the major portion of the Padgett lands to their predecessors in 1935 by deeds expressly executed under the provisions of Chapter 7861, Laws of *902 Florida, Acts of 1919.[1] Section 1 of that act vested in the Trustees of the Internal Improvement Fund "such title as the State of Florida has in all submerged, wet or low lands not embraced under the provisions of the Swamp Land Grant Act of September 28, 1850, which have been or may hereafter become drained or reclaimed by the drainage works of the Everglades Drainage District, title to which is now in the State of Florida." The 1935 deeds first identified the land conveyed by lot, section, township and range numbers and then continued as follows:
"together with adjoining area to the 17' contour of Lake Okeechobee, as shown on supplemental plat of said township and range recorded on August 20, 1935, in Plat Book 2, Page 83, Glades County Records * * *"
A drawing considered as evidence below by stipulation[2] indicates that the lands so conveyed extend from the southeast side of State Road 78 southeasterly toward the lake to a so-called "17' contour line."[3] This line was the "regulated high-water mark" of Lake Okeechobee in 1935 when the Trustees conveyed the Padgett lands. A so-called "Merriam meander line,"[4] which is shown on the drawing as running between and roughly parallel to State Road 78 and the 17' contour line, constitutes the so-called "state survey" or "official meander line" run in 1917-18 to show the former ordinary high-water mark of Lake Okeechobee.[5] That line marks the border between uplands, including swamp and overflowed lands acquired by the state under the Swamp Land Act of Congress of September 28, 1850, 9 Stat. 519, and land originally covered by navigable waters of Lake Okeechobee which the State of Florida acquired by virtue of its sovereignty upon its admission into the Union in 1845.[6] The drawing shows the District's levee located on land lying southeast of the 17' contour line, i.e., on land located between the Padgett land and the present ordinary or regulated high-water mark of Lake Okeechobee. The District admitted that this "strip of state owned or sovereignty land between the Padgett lands and the ordinary high-water mark of Lake Okeechobee" is "reclaimed land which was formerly covered by the waters of Lake Okeechobee." The District further admitted that such land "was uncovered and reclaimed by the lowering of the lake" and that this "was accomplished by artificial drainage conducted with the permission of the State of Florida." This land was reclaimed after the conveyance to the Padgetts and was thereafter conveyed by the Trustees to the District.
The Padgetts presently hold all rights originally granted to their predecessors by the 1935 deeds from the Trustees of the Internal Improvement Fund. We accept *903 the Padgetts' contention that all of those portions of their lands lying between the "Merriam meander," "state survey" or "official meander line" and the 17' contour line were subject to Chapter 7891, Laws of Florida, Acts of 1919 (Sections 253.36 et seq., Fla.Stats. F.S.A.), as well as Chapter 7861, which was adopted the same day and, as stated above, was expressly referred to in the 1935 deeds.[7]
Section 1 of Chapter 7891 (Section 253.36, Fla.Stats., F.S.A.) vested in the Trustees of the Internal Improvement Fund title to "all marsh, wet or low lands as have become permanently reclaimed, title to which is now in the State of Florida." Section 2 (Section 253.37, Fla.Stats., F.S.A.) authorized the Trustees to cause such lands to be surveyed and, subject to certain provisos, authorized the Trustees to sell them "in the same manner that other swamp and overflowed lands are now sold and disposed of." Section 3 (Section 253.38, Fla.Stats., F.S.A.) relied on by the Padgetts provides, in part, as follows:
"Nothing in this Act contained shall be construed as in any wise affecting the riparian rights now or heretofore existing under the Laws of this State * * *."[8]
The District relies, in part, upon certain reservations contained in the 1935 deeds,[9] and also upon a statutory reservation contained in Section 5 of Chapter 7861, supra.[10]
*904 An owner of land bounded by the high-water mark of navigable waters ordinarily is vested with certain riparian rights.[11] These include the right to an unobstructed view of such waters and the right to unobstructed access to them from his land, which may not be taken by the state without payment of just compensation.[12] Ordinarily, a riparian owner also becomes vested with title to such additional abutting soil or land as may gradually be formed or uncovered by the natural processes of accretion or reliction,[13] This is so even though his land formerly constituted swamp or overflowed land originally acquired by the state under the Swamp Land Act of 1850.[14] The doctrine of reliction, however, is applicable to additions created by the recession of waters from natural causes; it does not apply to land reclaimed by drainage operations of governmental agencies.[15] Where, as here, the state causes or permits the level of a navigable lake to be lowered so as to make the water recede and thereby uncover lands below the original high-water mark, lands so uncovered continue to belong to the state.[16] For this reason and because the Trustees of the Internal Improvement Fund had no authority to sell "sovereignty" land prior to the Acts of 1919, supra, a deed from them in 1904 conveying certain unsurveyed swamp and overflowed lands bordering on Lake Okeechobee was held not to include land "uncovered and reclaimed by the lowering of the lake level by artificial drainage, conducted by the state * * *."[17]
The 1935 deeds to the Padgetts' predecessors conveyed reclaimed swamp or overflowed lands as well as reclaimed sovereignty lands. Although the parties have stipulated that the 17' contour line was the "regulated ordinary high-water mark" of the lake at the time of the conveyances, it is not certain that the deeds necessarily included any riparian rights in the lake.[18] Assuming that the conveyance *905 did include riparian rights appurtenant to the lands, then such riparian rights are subject to all of the limitations, restrictions and reservations contained in the deeds and set forth in the applicable statutes. We specifically reject the Padgetts' contention that those reservations are applicable only to the land conveyed and are not applicable to their riparian rights, if any. Whatever riparian rights the Padgetts have arise from the deeds from the Trustees and from no other source. Thus the Padgetts may not, as they endeavor to do, treat their riparian rights as separate property not subject to the limitations or reservations set forth in their deeds and in the statutes authorizing the conveyances. The Padgetts further contend that the right-of-way for any canal or levee is limited in the reservation to 130 feet on either side of the center line, whereas the right-of-way for the District's levee is 900 feet. The second paragraph in the reserving clause of the deeds[19] does contain such a limitation as to a right-of-way but neither the first paragraph nor the statute contains any such limitation. We therefore hold that the construction of the levee is a work of drainage or reclamation contemplated in the reservations in the deeds and statutes and that the Padgetts' riparian rights, if any, are subject to the right of the District to construct the levee.[20] The provision in Chapter 7891 that that act shall not be construed as affecting riparian rights does not render nugatory the reservations in the deeds and in Chapter 7861. Chapter 7861 is specifically directed to lands reclaimed by works of the Everglades Drainage District, the predecessor to the Flood Control District; Chapter 7891 pertains to permanently reclaimed marsh, wet or low lands where the title was in the State of Florida and it makes no provision for any reservations. It is apparent that the two acts are materially and intentionally different and that the preservation of riparian rights without reservations was not intended by Chapter 7861.
There is another premise to support the decree. By Section 5 of Chapter 7861 the state reserved and retained the further right to regulate the level of Lake Okeechobee and provided that neither the state nor the Trustees nor those acting under them or by contract by or through them shall be liable for any damage, injury or claim on account of the raising or lowering of the waters of the lake. By exercising this right in lowering the water of the lake the former bottom lands thus exposed continued to be the property of the state with the right granted to the Trustees to sell such lands. The state-owned lands thus intervening between the Padgetts and the lake removed the Padgetts from any status as the owners of lands bounded by the high-water mark of navigable waters and vested with riparian rights.[21] The statute authorizing the conveyance to the Padgetts' predecessors in effect gave the state the right to change the status of the Padgett lands so that they would no longer be lands with riparian rights. The Padgetts cannot be now heard to claim the benefits of a conveyance pursuant to that act and at the same time reject the rights reserved to the state.
Affirmed.
SHANNON, Acting C.J., and SMITH, CULVER, Associate Judge, concur.
NOTES
[1] Sections 1-5 of Chapter 7861, included as Sections 1566-1570 of the Compiled General Laws, 1927, previously had been held to govern disposition of land uncovered from Lake Okeechobee by drainage operations. Carlton v. Raulerson, 1930, 100 Fla. 10, 128 So. 810. See also Jefferson Realty Co. v. Board of Com'rs, 1945, 156 Fla. 141, 23 So.2d 274. Chapter 7861 was omitted from the Florida Statutes. It is cited in a historical resume to Chapter 298, F.S.A., Appendix-Everglades Drainage District, Vol. 12 F.S.A., pp. 765-766.
[2] Tentative Drawing Number L-49-1, Sheet 2 of 5, Levee L-49 Right-of-Way and Topo Map, Engineering Division, Central and Southern Florida Flood Control District. The drawing bears the following stamped notice: "Not to be used for recording purposes nor referred to in instruments of conveyance."
[3] This line is identified as follows on the drawing: "17' contour survey for T.I.I.F. by W.T. Wallis (L.O. Datum) in May 1926."
[4] This line is identified as follows on the drawing: "Survey for T.I.I.F. by L.B. Merriam Nov. 1917 to Feb. 1918."
[5] See Martin v. Busch, 1927, 93 Fla. 535, 112 So. 274, which involved former bottom lands of Lake Okeechobee in Glades County which had been officially surveyed in 1917-18 under the supervision of F.C. Elliott.
[6] Ibid.
[7] In Martin v. Busch, supra at note 5, former Trustees of the Internal Improvement Fund also took the position that Chapter 7891 applied to lands reclaimed from the bed of Lake Okeechobee. See statement of facts at 93 Fla. 546, 112 So. 278. In its opinion the Supreme Court expressly assumed that Chapter 7891, as well as Chapter 7861, was applicable to such lands. See opinion at 93 Fla. 573, 112 So. 286-287. Chapter 7891 was included in the Compiled General Laws, 1927, as §§ 1425-1427.
[8] Section 3 of Chapter 7891 continues as follows:

"* * * but it is expressly provided that the provisions hereof shall apply only to such lands as the Department of the Interior has declined to convey to the State, or which have become permanently reclaimed, and in making sales thereof the Trustees are hereby authorized to provide for a complete system of reclamation as part of the consideration thereof, or to contract for such permanent reclamation in the manner they deem advisable."
[9] The deed reservations are as follows:

"SAVING AND RESERVING unto the said, The Trustees of the Internal Improvement Fund of the State of Florida, and their successors, the right at any time to enter upon the said lands and make or cause to be made and constructed thereon such canals, cuts, sluice-ways, dikes and other works as may in the judgment of the said Trustees, or their successors, be necessary and needful for the drainage or reclamation of any of the lands granted to the State of Florida, by Act of Congress, approved September 28th, 1850, * * *."
"AND FURTHER SAVING AND RESERVING unto the said, the Trustees of the Internal Improvement Fund of the State of Florida, the right to the exclusive possession, occupation, use and enjoyment of a strip of land running across the above described premises, one hundred and thirty feet on each side of the center line of any canal, cut, sluice-way or dike that may be made and constructed on said land by the said Trustees of the said Internal Improvement Fund of the State of Florida, or their successors, for the purpose aforesaid * * *."
[10] Section 5 reads as follows:

"The State of Florida reserves and retains the right to at any time enter upon such reclaimed lands and to make and to cause to be made and constructed thereon such canals, dikes, and other works as may be necessary and needful for the further drainage and reclamation of the lands granted to the State of Florida as swamp and overflowed lands, and also the right to construct and maintain dikes, levees, locks or other artificial devices or means for regulating the level of Lake Okeechobee, Lake Hicpochee, or other lakes within the territory affected by this Act, for the purpose of commerce, navigation, drainage or irrigation, and each and every conveyance of reclaimed lands made by the Trustees of the Internal Improvement Fund shall contain proper recital of said reservations, and neither the State, nor the Trustees of the Internal Improvement Fund, nor those acting under them or by contract by or through them, shall be liable for any damage, injury, or claim on account of the raising or lowering of the waters of any such lake for the purposes aforesaid, and the said Trustees are authorized to reserve from sale such lots or tracts as they deem necessary for works of drainage or appurtenances thereof." Comp.Gen. Laws, 1927, § 1570.
[11] 34 Fla.Jur., Waters and Watercourses, §§ 126-127; 1 Adkins, Florida Real Estate Law and Procedure, § 4.05.
[12] Thiesen v. Gulf, F. & A. Ry. Co., 1917, 75 Fla. 28, 78 So. 491, L.R.A. 1918E, 718, on rehearing, 1918, 75 Fla. 56, 78 So. 500.
[13] 34 Fla.Jur., Water and Watercourses, § 171; 3 Adkins, Florida Real Estate Law and Procedure, § 84.02.
[14] Forman v. Florida Land Holding Corporation, Fla. 1960, 121 So.2d 784.
[15] See Martin v. Busch, 1927, 93 Fla. 535, 574, 112 So. 274, 287; Conoley v. Naetzker, Fla.App. 1962, 137 So.2d 6.
[16] Martin v. Busch, supra; cf. McDowell v. Trustees of Internal Improvement Fund, Fla. 1956, 90 So.2d 715 (where riparian owner or navigable lake built peninsula adjacent to shoreline, land so created belonged to state).
[17] See concurring opinion of Brown, J., in Martin v. Busch at 93 Fla. 578, 112 So. 288.
[18] No Florida case has been found involving a grant of lands bordering upon the "regulated" high-water mark of a navigable lake. A riparian owner having title to uplands and submerged lands may separate them and convey both to different grantees or sell one and withhold the other. Caples v. Taliaferro, 1940, 144 Fla. 1, 197 So. 861. In Axline v. State, 1895, 35 Fla. 305, 17 So. 411, 28 L.R.A. 391, a deed from an owner of uplands and submerged lands which described the land conveyed as follows, was held not to include riparian rights: "[T]hence west * * * to the shore of Orange Lake; thence northwesterly, with said shore of said lake, to the north line of said section one * * *."
[19] See note 9.
[20] Cf. Albury v. Central & Southern Florida Flood Control District, Fla.App. 1957, 99 So.2d 248, and Hendry v. Atlantic Dredging & Construction Co., 1939, 140 Fla. 330, 191 So. 525.
[21] "Riparian rights are incident to the ownership of lands contiguous to and bordering on navigable waters. The common-law rights of riparian owners with reference to navigable waters are incident to the ownership of the uplands that extend to the highwater mark." Ferry Pass Inspectors' & Shippers' Ass'n v. Whites River Inspectors' & Shippers' Ass'n, 1909, 57 Fla. 399, 402, 48 So. 643, 644, 22 L.R.A.,N.S., 345.