Dr. Elton J. Gissendanner Executive Director Department of Natural Resources Marjory Stoneman Douglas Building 3900 Commonwealth Boulevard Tallahassee, Florida 32303
Dear Dr. Gissendanner:
This is in response to your request for an opinion on substantially the following questions:
 1. WHAT IS THE LEGAL DISPOSITION OF PROCEEDS DERIVED FROM THE SALE OR RENTAL OF THE FOLLOWING CATEGORIES OF STATE-OWNED LANDS?
A. INTERNAL IMPROVEMENT LANDS
B. SWAMP AND OVERFLOWED LANDS
C. SOVEREIGNTY LANDS
D. RECLAIMED LAKE BOTTOM LANDS
E. MURPHY ACT LANDS
F. SCHOOL LANDS (SECTION 16)
 G. LANDS OBTAINED FOR WATER RESOURCES PURPOSES PURSUANT TO CHAPTER 375, FLORIDA STATUTES
 H. OTHER STATE LANDS WHICH DO NOT FIT INTO A PARTICULAR CATEGORY
 2. IF STATE-OWNED LANDS ARE EXCHANGED FOR PRIVATE LANDS OR OTHER PUBLIC LANDS, TITLE TO WHICH IS NOT VESTED IN THE BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND, SHOULD THE LANDS OBTAINED BY THE BOARD BE CREDITED TO A PARTICULAR STATE FUND?
 3. CAN LANDS WHICH ARE GIVEN TO THE STATE FOR A SPECIFIC PURPOSE, E.G., SECTION 16 LANDS, OR WHICH ARE PRODUCING RENTAL INCOME BE DECLARED SURRLUS PURSUANT TO s 253.034(5), FLORIDA STATUTES?
You state in your letter that the staff of the Department of Natural Resources is in the process of submitting a recommended policy to the Board of Trustees of the Internal Improvement Trust Fund regarding the sale or other disposition of state-owned lands in the Everglades Agricultural Area. While gathering information and data to be included in this policy recommendation, you state that several issues have arisen regarding the disposition of the proceeds derived from the sale of these lands and other state-owned lands. On April 19, 1984, the Board of Trustees of the Internal Improvement Trust Fund adopted a motion that requested the Department of Natural Resources staff to prepare a plan for the sale or exchange of state-owned lands in the Everglades Agricultural Area.
According to your letter, the State of Florida holds title to approximately 88,000 acres of land in the Everglades Agricultural Area, 19,000 of which are currently being leased to private persons or companies. From information obtained from members of your staff, it appears that the Everglades Agricultural Area includes within its boundaries the former Everglades Drainage District created by s 1, Ch. 6456, 1913, Laws of Florida. However, the boundaries of the Everglades Agricultural Area encompass other lands outside the boundaries of the dissolved Everglades Drainage District. Therefore, it must be noted at the outset that this opinion is expressly limited to a consideration of the general statutes of the state pertaining to the disposition of proceeds from the sale or lease of state-owned lands within the Everglades Agricultural Area along with the laws of Florida relating to the old Everglades Drainage District, and does not venture to speculate on the possible effects of any other general or special acts not contained in the Florida Statutes on other state-owned lands within the territorial boundaries of the Everglades Agricultural Area, if any such laws exist. My research has not disclosed any such laws nor have you brought any other laws to my attention.
QUESTION ONE
The laws pertaining to the disposition of proceeds from the sale or lease of state-owned lands direct the disposition based on the classification of land in question. Therefore, this opinion will follow the format set forth in your inquiry which lists several categories of state-owned land. Discussion of the impact of s253.034, F.S., which provides for the disposition of certain surplus state lands, on the disposition of proceeds from the sale of state-owned lands is considered in Question Three.
A. INTERNAL IMPROVEMENT LANDS
The United States, by act of Congress of September 4, 1841,5 Stat. 455, granted to certain designated states and to each new state admitted thereafter into the Union 500,000 acres of land, located within the boundaries of such states, for the general purpose of internal improvement. The Florida Territory, ceded by Spain to the United States in 1819 under the Treaty of Amity, Settlement, and Limits ratified in 1821, was admitted into the Union by an act of Congress approved March 3, 1845, as the State of Florida, on equal terms with the original states. It is by effect of these two acts of Congress and Florida's assent to the terms of admission into the Union (see, s 6.01, F.S.) that the state took title to the lands designated as Internal Improvement Lands.
Section 253.01, F.S., specifically pertaining to the Internal Improvement Trust Fund, provides:
 (1) So much of the 500,000 acres of land granted to this state for internal improvement purposes, by an Act of Congress passed March 3, A.D. 1845, as remains unsold, and the proceeds of the sales of such said lands heretofore sold as now remain on hand and unappropriated, and all proceeds that may hereafter accrue from the sales of said lands; also, all the swampland or lands subject to overflow, granted this state by an Act of Congress approved September 28, A.D. 1850, together with all the proceeds that have accrued or may hereafter accrue to the state from the sale of such lands, are set apart, and declared a separate and distinct fund called the Internal Improvement Trust Fund of the state, and are to be strictly applied according to the provisif this chapter.
 (2) All revenues accruing from sources designated by law for deposit in the Internal Improvement Trust Fund shall be used for the acquisition, management, administration, protection, and conservation of state-owned lands.
Pertaining to the disposition of the proceeds derived from the sale of state lands in general, s 270.22, F.S., provides:
 The proceeds of state land, whether from sale, lease, rental, or the sale, lease, or rental of products in, on, or under such land, title to which has been or may be vested in the Board of Trustees of the Internal Improvement Trust Fund by the Legislature of this state, or of land which has been or may be received by the board of trustees from other sources, shall be paid into the Internal Improvement Trust Fund to become a part of that fund, subject to disposition as is provided by the laws of this state relating thereto.
Section 270.23, F.S., recognizes the State School Trust Fund as a fund which is to receive payments from the proceeds of the sale of state lands, and provides:
 After payments have been made to the State School Trust Fund, as provided by the constitution and by law, any balance shall be and remain a part of the Internal Improvement Trust Fund to be applied by the board of trustees of that fund to the payment of the expenses and the administration of that fund, including the lands thereof, and to such other purposes as prescribed by law.
Formerly, s 4, Art. XII, 1885 State Const., provided that included among the sources of the State School Fund would be twenty-five percent of the sales of `public land' owned by the state. At the time the 1968 Constitution was adopted this provision was not included. Section 10, Art. XII, State Const., preserved all existing provisions of the 1885 Constitution that were not inconsistent with the new constitution as statutes subject to modification or repeal as are other statutes. In 1972, the Legislature expressly included the former constitutional provision in an act relating to education. Chapter 72-221, Laws of Florida. Section 228.151, F.S., created by Ch. 72-221, in pertinent part, provides: `The State School Fund shall be derived from the following sources: . . . (5) Twenty-five percent of the sales of public lands which are now or may hereafter be owned by the state.'
The question of what constitutes `public lands' for purposes of effectuating the provisions of s 228.151, F.S., has been resolved by an early Florida Supreme Court decision, not subsequently overruled or affected by later legislative amendments, with one possible exception. See discussion under Question Three. In State ex rel. Town of Crescent City v. Holland, 10 So.2d 577, 587
(Fla. 1942), the Florida Supreme Court addressed the question of what are `public lands.'
 The words `public lands' as used in section 4, Article VIII of the constitution of 1868 and in section 4, Article XII of the constitution of 1885, have reference to open areas of land the title to which is based upon sovereign grants from the United States to Florida, and designed for general publid purposes such as education, internal improvements, and drainage and reclamation, the lands being in their natural undeveloped condition and generally in large contiguous areas. Such `public lands' include the 500,000 acres granted to the States for general internal improvement purposes by an Act of Congress approved September 4, 1841, 5 Stat. 455, and available to Florida upon its admission as a State in 1845, 5 Stat. 742, and the swamp and overflowed lands granted to the States for general drainage and reclamation purposes by Act of Congress of September 28, 1850, 9 Stat. 519. The above are `public lands' within the scope, meaning and intendments of the provision of section 4, Article XII of the constitution of 1885, relating to sales of public lands of the State.
Applying these statutes to state-owned lands classified as Internal Improvement Lands, it is my opinion that twenty-five percent of the proceeds from the sale of Internal Improvement Lands should be paid into the State School Fund with the balance to be paid into the Internal Improvement Trust Fund.
Regarding the proceeds from the rental or lease of Internal Improvement Lands, s 270.22, F.S., as set forth above, specifically provides that `[t]he proceeds of state land, whether from sale, lease, rental, or the sale, lease, or rental of products in, on, or under such land, title to which has been or may be vested in the Board of Trustees of the Internal Improvement Trust Fund . . . shall be paid into the Internal Improvement Trust Fund. . . .' (e.s.) My research has not revealed nor has my attention been directed to any other statute pertaining to Internal Improvement Lands which would affect this statutory directive, and therefore, it is my opinion that the proceeds from the lease or rental of Internal Improvement Lands should be deposited in the Internal Improvement Trust Fund.
B. SWAMP AND OVERFLOWED LANDS
This category of state-owned land is defined as those lands granted to the State of Florida by act of Congress of September 28, 1850, Swamp Land Grant Act of 1850, 43 U.S.C. ss 982, et seq.[1]See generally, 63A Am.Jur.2d State Lands ss 109-111. Seealso, 42 Fla.Jur.2d Public Lands s 17. The Legislature in recognition of this grant placed the swamp and overflowed lands in the internal improvement fund of the state and vested the title in five trustees known as the trustees of the internal improvement fund, now the Board of Trustees of the Internal Improvement Trust Fund. See, Trustees of Internal Improvement Fund v. Root,58 So. 371 (Fla. 1912); Byrne Realty Company v. South Florida Farms Company, 89 So. 318 (Fla. 1921). The title to swamp and overflowed lands is presently vested in the Board of Trustees of the Internal Improvement Trust Fund. See, s 253.03(1)(a), F.S. Section 253.01, F.S., set out in full above, in pertinent part, provides that `all the swampland or lands subject to overflow, granted this state by an Act of Congress approved September 28, A.D. 1850, together with all the proceeds that have accrued or may hereafter accrue to the state from the sale of such lands, are set apart, and declared a separate and distinct fund called the Internal Improvement Trust Fund of the state. . . .' As state lands, swamp and overflowed lands would be subject to the disposition provisions of ss 270.22
and 270.23, F.S., discussed above. Whether swamp and overflowed lands are `public lands' and thus subject to the provisions of s 228.151, F.S., relating to the State School Fund is answered by the decision of State ex rel. Town of Crescent City v. Holland, supra. The Florida Supreme Court at page 587 stated: `Such `public lands' include . . . the swamp and overflowed lands granted to the States for general drainage and reclamation purposes by Act of Congress of September 28, 1850, 9 Stat. 519.' Therefore, as with the sale of other Internal Improvement Lands, twenty-five percent of the proceeds from the sale of swamp and overflowed lands is to be deposited in the State School Fund with the remainder to be paid into the Internal Improvement Trust Fund. Proceeds from the rental or lease of this category of state-owned lands are to be paid into the Internal Imrpovement Trust Fund as provided by s 270.22, F.S.
C. SOVEREIGNTY LANDS
The State of Florida at the time it was admitted into the Union in 1845 and as part of the state's sovereign rights acquired title to all lands under navigable waters within the boundaries of the state. Section 11, Art. X, State Const., in pertinent part, provides: `The title to lands under navigable waters, within the boundaries of the state, which have not been alienated, including beaches below mean high water lines, is held by the state, by virtue of its sovereignty, in trust for all the people.' These lands include the beaches below the mean high water lines and all `tidelands' (lands covered and uncovered by daily ebb and flow of normal tides). See, Martin v. Busch, 112 So. 274 (Fla. 1927). As to navigable waters, the court in Martin v. Busch, supra, at 283, stated: `The navigable waters include lakes, rivers, bays, or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts towards the outside lines or elsewhere, or whether the waters are navigable during the entire year or not.' See also, Odom v. Deltona Corp., 341 So.2d 977 (Fla. 1976) (meandering is evidence of navigability which creates a rebuttable presumption thereof); Baker v. State ex rel. Jones,87 So.2d 497 (Fla. 1956) (to be navigable a body of water must be permanent in character, of sufficient size and so situated that it may be used for purposes common or useful to the public in the locality); Broward v. Mabry, 50 So. 826 (Fla. 1909). The distinction between submerged sovereignty lands and swamp and overflowed lands is based on the different derivation of title in the state. The state acquired title to its swamp and overflowed lands pursuant to an act of Congress of September 28, 1850,9 Stat. 519. See discussion under Question l. B. of this opinion dealing with swamp and overflowed lands. See also, State ex rel. Ellis v. Gerbing, 47 So. 353 (Fla. 1908). The state did not acquire any title to sovereignty lands pursuant to the 1850 act since title to such sovereignty lands had passed to the state on its admission to the Union. For a general discussion of the differences between sovereignty lands and swamp and overflowed lands, see, Rosen, Public and Private Ownership Rights in Lands under Navigable Waters: The Governmental Proprietary Distinction, 34 U.Fla.L.Rev. 561, 581 (1982). See also, 42 Fla.Jur.2d PublicLands s 16.
Sovereignty lands are a class of state-owned lands title to which is vested in the Board of Trustees of the Internal Improvement Trust Fund. See, s 253.03(1)(b), F.S. Therefore, the proceeds from the sale of sovereignty lands must be disposed of pursuant to s270.22, F.S., which provides, as set forth above, that the proceeds from the sale of state lands title to which has been or may be vested in the Board of Trustees shall be paid into the Internal Improvement Trust Fund. Sovereignty lands are not considered public lands for purposes of s 228.151, F.S., and thus the twenty-five percent designation specified therein is not applicable. See, State ex rel. Town of Crescent City v. Holland, supra. Accord, AGO 69-90.
Section 270.22, F.S., also controls the disposition of the proceeds from the rental of sovereignty lands providing that the proceeds of state lands, whether from the sale, lease, or rental, shall be paid into the Internal Improvement Trust Fund. Compare, s253.03(2), F.S., specifying that a using agency is `entitled to the proceeds from the sale of products on, under, growing out of, or connected with lands which such using agency holds under lease or similar instrument from the board of trustees.'
D. DECLAIMED LAKE BOTTOM LANDS
The land discussed in this section is expressly confined to land reclaimed from navigable lakes since title to other reclaimed lake bottom lands may or may not be vested in the state. See, 42 Fla.Jur.2d Public Lands s 65. Nor does this opinion address the legal issues involving the rightful ownership of lake bottom lands uncovered through reliction or other natural causes. See, Martin v. Busch, 112 So. 274 (Fla. 1927); Mexico Beach Corp. v. St. Joe Paper Co., 97 So.2d 708 (1 D.C.A. Fla., 1957), cert. den.,101 So.2d 817 (Fla. 1958). See generally, 78 Am.Jur.2d Waters s 406. These reclaimed lake bottom lands are a special variety of sovereignty lands and are defined as those lands which have been permanently reclaimed by action of a governmental agency, such as by drainage. See, Martin v. Busch, supra. Where the waters of a navigable lake are caused to recede by drainage operation, the lands so uncovered are still classified as sovereignty lands because they were originally sovereignty lands belonging to the state and the action taken to reclaim such lands does not affect their legal status. See, Martin v. Busch, supra.
The reclaimed lake bottom lands in the Everglades Agricultural Area are assumed for purposes of this opinion to fall within the old boundaries of the Everglades Drainage District. Chapter 6456, 1913, Laws of Florida, created the Everglades Drainage District. (This district was succeeded by the Central and Southern Florida Flood Control District, created by Ch. 25270, 1949, Laws of Florida. See, Chapter 298 Appendix, F.S.A.) The district began drainage operations and land was reclaimed, title to which remained in the state by virtue of its sovereign ownership of bottom lands lying under navigable waters. See, Martin v. Busch, supra; Padgett v. Central and Southern Florida Flood Control District, 178 So.2d 900 (2 D.C.A. Fla., 1965). The Legislature in 1919 enacted Ch. 7861, Laws of Florida, entitled `An act Fixing the Status of Land Reclaimed by the Works of the Everglades Drainage District and Providing for the Sale or Lease Thereof.' Section 1 of that law provided:
 That such title as the State of Florida has in all submerged, wet or low lands not embraced under the provisions of the Swamp Land Grant Act of September 28, 1850, which have been or may hereafter become drained or reclaimed by the drainage works of the Everglades Drainage District, title to which is now in the State of Florida, is hereby vested in the Trustees of the Internal Improvement Fund, to be held, administered, sold or leased by them as provided herein.
Thus, Ch. 7861 expressly excluded from its terms swamp and overflowed lands that the State of Florida had acquired, subsequent to the state becoming a member of the Union, pursuant to the Swamp Land Grant Act of September 28, 1850, supra. Secondly, Ch. 7861 applied only to submerged, wet, or low lands which have been or may hereafter become drained or reclaimed by the drainage works of the Everglades Drainage District. Section 2 of Ch. 7861 gave the Trustees of the Internal Improvement Fund the authority to construct such additional works as may be advisable for completely draining said lands. Section 3 of Ch. 7861 authorized the Trustees `to sell, convey or lease any and all such lands as are embraced under the provisions of this Act on such terms, in such manner, and at such time as they deem advisable.' Section 4 of that act provides that `all moneys arising and resulting from the sale thereof shall be appropriated and applied to and become a part of the permanent School Fund of the State of Florida,' (e.s.) after the Trustees had been reimbursed for the costs of any additional drainage works pursuant to Section 2 of Ch. 7861. This law has never been expressly repealed or superseded by an act of the Legislature. During the same year Ch. 7861 was enacted specifically relating to the Everglades Drainage District, the Legislature enacted Ch. 7891, 1919, Laws of Florida, entitled `An Act to define the Ownership in Certain Marsh, Wet or Low Lands in this State and to Authorize the Survey and Disposition Thereof.' In the pertinent whereas clauses the Legislature stated: `There are now in this State considerable areas of marsh, wet or law [sic] lands which have been entirely or partially exposed by the process of dredging and other causes'; and further that `[u]nder the holdings of the Department of the Interior these lands are not covered by the Swamp Land Grant Act of September 28, 1850, and cannot therefore be conveyed to the State thereby. . . .' Section 1 of Ch. 7891 provides `[t]hat the title to all marsh, wet or low lands as have become permanently reclaimed, title to which *2646 is now in the State of Florida, are hereby vested in the Trustees of the Internal Improvement Fund to be held by the State and disposed of as hereinafter provided.' Section 2 of that act in pertinent part provides for the disposal of lands subject to Ch. 7891: `When such surveys have been completed and with [sic] the plats thereof have been filed in the office of the Secretary of the said Trustes [sic], the Trustees may proceed to sell and convey the said lands so surveyed in the same manner that other swamp and overflowed lands are now sold and disposed of. . . .' Chapter 7891 was subsequently codified, amended and is carried forward as ss 253.36-253.38, F.S.
The question of the respective applicability of Chs. 7861 and 7891, 1919, Laws of Florida, to reclaimed lake bottom lands has been raised by interested landowners and leaseholders within the Everglades Agricultural Area. The contention that Ch. 7891, now ss253.36-253.38, F.S., impliedly repeals or supersedes Ch. 7861, 1919, Laws of Florida, has been addressed and resolved by the courts. In Padgett v. Central and Southern Florida Flood Control District, 178 So.2d 900, 905 (2 D.C.A. Fla., 1965), the district court after a review of the two acts concluded: `It is apparent that the two acts are materially and intentionally different and that the preservation of riparian rights without reservations was not intended by Chapter 7861.' An examination of the two acts reinforces the court's conclusion that the scope of the acts are materially and intentionally different. Chapter 7861 specifically applies to submerged, wet, or low lands drained or reclaimed by the drainage works of the Everglades Drainage District. Thus, this act has a limited geographical application. Chapter 7891, on the other hand, has statewide application to all marsh, wet, or low lands which have been permanently reclaimed. Nor can I discern any legislative intent that Ch. 7891 impliedly repealed or amended Ch. 7861, dealing specifically with reclaimed lands within the Everglades Drainage District. It is a well-established rule of statutory construction that the implied repeal or amendment of a statute is not favored. See, Town of Indian River Shores v. Richey, 348 So.2d 1 (Fla. 1977); Mann v. Goodyear Tire Rubber Co., 300 So.2d 666 (Fla. 1974); State v. Gadsden County,58 So. 232 (Fla. 1912). Furthermore, even in those situations when a general law includes the same subject matter as a special or local law, the special law will generally be considered to be an exception to or qualification of the general law. See, Loxahatchee River Environment Control District v. Mann, 403 So.2d 363 (Fla. 1981) (the general rule that a special act takes precedence over a general law dealing with the same subject matter especially holds true when both laws are passed during the same legislative session); State ex rel. Johnson v. Vizzini, 227 So.2d (Fla. 1969); State ex rel. Luning v. Johnson, 72 So. 477 (Fla. 1916). Seegenerally, 82 C.J.S. Statutes s 369. And see, Villery v. Florida Parole and Probation Commission, 396 So.2d 1107 (Fla. 1980), in which the Florida Supreme Court stated that whenever possible full effect must be given to all statutory provisions and related statutory provisions should be construed in harmony with each other.
The courts of this state have treated Ch. 7861 as a valid enactment not in conflict with other provisions of the Florida Statutes. See, e.g., Jefferson Realty Co. v. Board of Commissioners of Everglades Drainage District, 23 So.2d 274 (Fla. 1945); Martin v. Busch, supra. Nor does my examination of other provisions of Ch. 253, F.S., reveal any positive repugnancy or intent by enactment of comprehensive legislation to supersede the application and continued validity of Ch. 7861 as applied to reclaimed lake bottom lands located within the geographical boundaries of the former Everglades Drainage District.
Section 253.12, F.S., has been cited in supplemental memoranda supplied by interested private parties in support of the position that this statute supersedes the application of Ch. 7861 to reclaimed lake bottom lands located in the Everglades Agricultural Area. Subsection (1) of this statute, in pertinent part, provides:
 Except submerged lands heretofore conveyed by deed or statute, the title to all sovereignty tidal and submerged bottom lands, including all islands, sandbars, shallow banks, and small islands made by the process of dredging any channel by the United States Government and similar or other islands, sandbars, and shallow banks located in the navigable waters, and including all coastal and intracoastal waters of the state and all submerged lands owned by the state by right of its sovereignty in navigable freshwater lakes, rivers, and streams, is vested in the Board of Trustees of the Internal Improvement Trust Fund.
It is my conclusion that this statute does not supersede Ch. 7861. Section 253.12 finds its genesis in a 1917 law. Chapter 7304, 1917, Laws of Florida. At that time the law was not applicable to submerged lands in navigable freshwater lakes. Title to this category of lands within the Everglades Agricultural District was vested in the board of trustees by Ch. 7861. Thus, the legal title to such lands and the method and manner of their disposition is derived historically from independent statutory roots. As stated above, the courts have not interpreted Ch. 7861 as being in conflict with other provisions of Florida laws. See, Jefferson Realty Co. v. Board of Commissioners of Everglades Drainage District, supra; Martin v. Busch, supra. In 1969, s 253.12, F.S., was amended to include submerged land in navigable freshwater lakes, rivers and streams. However, it must be recalled that the purpose of subsection (1) of s 253.12 was to vest title to all sovereignty lands in the Board of Trustees of the Internal Improvement Trust Fund, `[e]xcept submerged lands heretoforeconveyed by deed or statute' to the board of trustees. (e.s.) The title to the lands in question within the former Everglades Drainage District had previously been transferred to the board of trustees by the express terms of Ch. 7861. Moreover, the lands in question, reclaimed lake bottom lands, were at the time of the 1968 amendment factually distinguishable from other submerged lands, since they had been reclaimed by the drainage projects undertaken by the former district and the board of trustees. See, ss 1 and 2, Ch. 7861, 1919, Laws of Florida.
It is therefore my opinion that, until and unless judicially determined otherwise, Ch. 7861, 1919, Laws of Florida, would control the disposition of proceeds derived from the sale of reclaimed lake bottom lands located in the Everglades Agricultural Area which are within the geographical boundaries of the former Everglades Drainage District. Section 4 of Ch. 7861 provides that all moneys arising and resulting from the sale of such lands shall be appropriated and applied to and become a part of the permanent School Fund of the State of Florida subject to the reimbursement to the Board of Trustees for the cost of any additional drainage works as specified in section 2 of the act. Chapter 7861, however, makes no specific provision for the disposition of proceeds from the rental of those sovereignty lands, and therefore, such moneys should be paid into the Internal Improvement Trust Fund as provided by s 270.22, F.S.
Other reclaimed lake bottom lands located outside the boundaries of the former Everglades Drainage District should be disposed of pursuant to the provisions of s 253.37, F.S. Pertinent portions of this statute provide that `the board [of trustees] may proceed to sell and convey the said lands so surveyed in the same manner that other swamp and overflowed lands are sold and disposed of. . . .' Therefore, as concluded under section B. of this question pertaining to the disposition of the proceeds from the sale of swamp and overflowed lands, twenty-five percent of the proceeds from the sale of reclaimed lake bottom lands outside the boundaries of the former Everglades Drainage District should be paid into the State School Fund with the remainder to be paid into the Internal Improvement Trust Fund. Proceeds from the rental or lease of this category of state-owned land are to be paid into the Internal Improvement Trust Fund as provided by s 270.22, F.S.
E. MURPHY ACT LANDS
In 1984, the Legislature amended the laws relating to Murphy Act Lands. Chapter 84-197, Laws of Florida. These lands derive their name from having come into state ownership by operation of Ch. 18296, 1937, Laws of Florida, commonly known as the Murphy Act. Section 2 of Ch. 84-197 created s 253.82, F.S., which in subsection (2)(a) of the new statute provides: `Title to any land which was acquired by the state under chapter 18296, Laws of Florida, 1937, except those parcels which have been sold, conveyed, dedicated, or released by the state pursuant to subsection (1), is hereby vested in the Board of Trustees of the Internal Improvement Trust Fund.' Paragraph (b) of subsection (2) of this new statute directs the disposition of the proceeds from the sale of Murphy Act lands: `Land to which title is vested in the board of trustees by paragraph (a) shall be treated in the same manner as other nonsovereignty lands owned by the board, and all revenues derived from such land shall be deposited in the Internal Improvement Trust Fund.' Section 4 of Ch. 84-197 amended subsection (5) of s 253.034, F.S., to eliminate a possibly inconsistent provision in that statute by deleting a reference to Murphy Act lands contained in subsection (5). See, staff analysis of Senate Bill No. 503, enacted as Ch. 84-197, Laws of Florida. Thus, the proceeds from the sale or rental of Murphy Act Lands are to be deposited in the Internal Improvement Trust Fund as provided by s 253.82, F.S. (1984 Supp.).
F. SCHOOL LANDS
These state-owned lands are those lands which have been granted to the State of Florida by the United States to be used for public school purposes. The lands were granted to the state by an act of Congress of March 3, 1845, 5 Stat. 742, and consisted of the sixteenth section in every township in the state for the use of the inhabitants for the support of public schools. See, Askew v. Sonson, 409 So.2d 7 (Fla. 1981). For a number of reasons it was impossible to set aside all sixteenth sections for school purposes either due to prior conveyances or the fractional nature of the sections. See generally, 63A Am.Jur.2d Public Lands s 112. Where there was a deficiency, the state was authorized by the Lieu Land Statute, 43 U.S.C. § 851, to select unappropriated government lands in lieu of the deficiency. See, Hampton v. Matheson,164 So. 714 (Fla. 1935). As stated in Askew v. Sonson, supra, at 9: `This grant of school lands was an absolute grant, vesting title in the state of Florida.'
Section 228.151, F.S., formerly s 4, Art. XII, 1885 Const., was converted to statutory law by s 10, Art. XII, State Const., and revised by Ch. 72-221, Laws of Florida. This statute provides for the sources of funds for the State School Fund. Subsection (1) of s 228.151 provides that the School Fund shall be derived from `[t]he proceeds of all lands that have been or may hereafter be granted to the state by the United States for public school purposes[.]' This provision does not differentiate between proceeds derived from the sale of state school lands and proceeds received from the rental of such school lands but instead directs that the school fund shall be derived from `the proceeds of all [school] lands.' Therefore, it would appear that, because the statute does not limit the school fund to proceeds from the sale of school land, such fund should receive all proceeds whether derived from the sale or rental of state school lands.
G. LANDS OBTAINED FOR WATER RESOURCE PURPOSES PURSUANT TO CH. 375, F.S.
Sections 375.011-375.061, F.S., known as the Outdoor Recreation and Conservation Act of 1963, constitute legislation for the development of a comprehensive, multipurpose, outdoor recreation and conservation plan. Section 375.021, F.S. The Department of Natural Resources (hereafter DNR) `is empowered and authorized to identify for acquisition lands, water areas, and related resources. . . .' Section 375.031(1), F.S. The Board of Trustees of the Internal Improvement Trust Fund holds the title to lands acquired under the act, but DNR has the beneficial use, control and management of such lands.
Lands under Ch. 375 are acquired with funds from the Land Acquisition Trust Fund. Id. Section 375.041, F.S., creates the Land Acquisition Trust Fund as a separate state trust administered by DNR in order `to facilitate and expedite the acquisition of land, water areas, and related resources required to accomplish the purposes of [the] act.' Subsection (8) of s 375.031, F.S., provides that DNR may `if it deems it desirable and in the best interest of the program, request the board of trustees to sell or otherwise dispose of any lands or water storage areas acquired under [the] act.' This subsection further provides that `[a]ll proceeds from the sale or disposition of any lands or water storage areas pursuant to this section shall be deposited in the Land Acquisition Trust Fund.' Section 375.041, F.S., pertaining to the Land Acquisition Trust Fund in subsection (1) provides: `All moneys and revenue from the operation, management, sale, lease, or other disposition of land, water areas, related resources, and the facilities thereon acquired or constructed under this act shall be deposited in or credited to the Land Acquisition Trust Fund.' Based on these provisions it is therefore my opinion that the proceeds from the sale and rental of land obtained under Ch. 375, F.S., shall be deposited in or credited to the Land Acquisition Trust Fund.
H. OTHER STATE LAND
The disposition of the proceeds from the sale or rental of other state-owned lands which do not fit into a particular category is dependent upon the terms of the statute or other law under which such lands were acquired or are classified. For example, Ch. 84-287, Laws of Florida, an act relating to the Cross Florida Barge Canal, provides for the retention and disposition of lands involved thereunder. Any surplus proceeds remaining after payment provided under Ch. 84-287 is to be paid into the Cross Florida Barge Canal Trust Fund. And subsection (12) of s 253.03, F.S., relating to RICO Act Lands acquired pursuant to ss 895.01-895.09, F.S., provides for the disposition of proceeds resulting from the sale of such lands. Therefore, as a general proposition I am unable to state the proper disposition of proceeds from all other state lands in the absence of a specific type of state land in question and an examination of the laws relating to sale or rental of such land.
QUESTION TWO
Section 253.42, F.S., authorizes the Board of Trustees of the Internal Improvement Trust Fund to exchange lands held or owned by, or vested in, the Board for other lands in the state owned by private individuals. This statute goes on to authorize the Board to `fix the terms and conditions of any such exchange, and select and agree upon the lands to be so conveyed by said board; . . . and agree upon and pay or receive, as the case may in the judgment of said board require, any sum or sums of money deemed necessary by said board for the purpose of equalizing the values of such exchanged property. . . .' Your question raises the issue of whether land obtained by the state in an exchange pursuant to this or other statute should be classified as the same type of state-owned land as that for which it was exchanged.
No provision of Ch. 253, F.S., addresses this issue. Compare, s270.20, F.S., which provides that, whenever title to lands or other property sold by the state or by an agency thereof becomes vested again in the state as a result of the foreclosure by the state of a mortgage on such lands or a forfeiture or otherwise pursuant to ss 270.16-270.19, F.S., the lands go into the particular state fund or state department from which they originated or to which they may be conveyed. It would appear, however, that the correct result is that the land obtained in the exchange should be classified according to the type of state-owned land exchanged. In Watson v. Caldwell, 35 So.2d 125 (Fla. 1948), the Florida Supreme Court upheld the validity of an exchange of state-owned lands where the State Board of Education conveyed certain school land in exchange for swamp and overflowed lands from the old trustees of the Internal Improvement Fund. The trustees then conveyed the school lands to the United States for national park purposes. It was contended that the lands held by the State Board of Education were school lands held in trust for the benefit of the state school fund and could not be disposed of except by advertisement and sale to the highest bidder as provided by statute. The court disposed of this contention stating: `There is not the slightest suggestion that the land received in exchange by the Board was not of equal value to the lands disposed of, so the school fund was not in the slightest depleted, and being so this contention fades out of the picture.' 35 So.2d at 127. The court concluded that the integrity of the school fund had been preserved since the land received by the State Board of Education in the exchange was of equal value to the lands conveyed by the Board. Presumably, where there is a difference in the values of the lands exchanged, any sums of money received by the state should be placed in the trust fund entitled to the proceeds of an outright sale.
Thus, under the rationale of Watson v. Caldwell, if the land received by the state in an exchange is classified as the same type as that land for which it was exchanged, then there is no problem with any possible violation of a public trust as the integrity of the particular fund would be maintained. Applying the principles of this decision to the instant inquiry and in the absence of any legislative direction on this point, it is my opinion, until legislatively or judicially determined otherwise, that, where state-owned lands are exchanged for private lands or other public lands, the land obtained by the Board of Trustees in the exchange should be classified as the type of state-owned land for which it was exchanged.
QUESTION THREE
Section 253.034, F.S. (1984 Supp.), among other things, provides for the disposition of certain surplus state lands. You have inquired whether lands given to the state for a specific purpose or which are producing rental income can be declared surplus pursuant to s 253.034(5), F.S. (1984 Supp.). An answer to your question requires both a detailed analysis of the entire statute to determine the legislative intent as well as a review of federal laws pertaining to the grant of Section 16 lands to the state for public school purposes.
Section 253.034, F.S., was created by Ch. 80-280, Laws of Florida. The title to that law provides that it is an act relating to the management of state-owned, leased or assigned lands; directing the Board of Trustees of the Internal Improvement Trust Fund to determine certain facts about state lands; and providing for the disposal of such lands under certain circumstances. An examination of s 253.034 reveals a legislative intent that a comprehensive treatment of and planning for the utilization of state lands be undertaken. The overall purpose of the law was to assure that `[a]ll lands owned by the Board of Trustees of the Internal Improvement Trust Fund shall be managed in a manner that will provide the greatest combination of benefits to the people of the state.' Section 253.034(2).
Section 253.034 requires all state agencies managing land to submit land management plans. Subsection (4) provides: `Each state agency managing lands owned by the Board of Trustees of the Internal Improvement Trust Fund shall submit to the Division of State Lands a land-management plan no later than July 1, 1984, and at least every 5 years thereafter, in a form and manner prescribed by rule by the board no later than January 1, 1984.' These management plans are required to `describe how the managing agency plans to identify, locate, protect and preserve, or otherwise use fragile nonrenewable resources, such as archaeological and historic sites, as well as other fragile resources, including endangered plant and animal species.' Id. The Division of State Lands is required to submit a copy of each land-management plan for parcels which exceeds 160 acres to members of the Land Management Advisory Committee. Subsection (4)(a). After review, this advisory committee is to recommend to the Board of Trustees whether to approve the plan as submitted, approve the plan with modification, or reject the plan. Id. The Board in turn must approve the plan with or without modification or reject the plan. Subsection (4)(b). `The use or possession of any such lands which is not in accordance with an approved land-management plan shall be subject to termination by the board.' Id.
Subsection (5) of s 253.034 provides for the disposition of certain lands under certain conditions. Generally, lands which are not being used for the purpose for which they were originally leased or lands owned by the board not actively managed by any state agency or for which a land-management plan has not been completed are subject to disposal under subsection (5). Subsection (5), as amended by Ch. 84-197, Laws of Florida, provides: `The Board of Trustees of the Internal Improvement Trust Fund shall determine which lands, the title to which is vested in the board, are of no benefit to the public and shall dispose of such lands pursuant to law.' Paragraph (a), applying to state lands which are managed by a state agency, provides:
 No later than July 1, 1984, and at least every 5 years thereafter, in a form and manner prescribed by rule by the board, each state agency shall indicate to the board those lands which the agency manages which are not being used for the purpose for which they were originally leased. Such lands shall be reviewed by the Land Management Advisory Committee for its recommendation as to whether such lands shall be disposed of by the board.
As to other lands, paragraph (b) provides: `Lands owned by the board which are not actively managed by any state agency or for which a land-management plan has not been completed pursuant to subsection (4) shall be reviewed by the Land Management Advisory Committee for its recommendation as to whether such lands shall be disposed of by the board.' Paragraph (c) provides for consideration of whether ownership of lands reviewed pursuant to paragraphs (a) and (b) would be more appropriately owned or managed by the county or other unit of local government in which the land is located. Finally, paragraph (d), provides:
 After reviewing the recommendations of the Land Management Advisory Committee, the board shall determine whether lands identified in paragraphs (a) and (b) shall be held for other public purposes or whether such lands are of no benefit to the public. The board may require an agency to release its interest in such lands. Lands determined to be of no benefit to the public shall be disposed of pursuant to law. The proceeds from the disposal of such lands shall be placed in the Conservation and Recreation Lands Trust Fund.
When read together, the provisions of subsection (5) and the other provisions of s 253.034, F.S., as amended by Ch. 84-197, Laws of Florida, contemplate a comprehensive approach to management of public lands in the State of Florida. All state-owned land should be included in a land management plan which is approved by the Board of Trustees and periodically reviewed. The statute represents an attempt to eliminate a piece-meal approach to public land use in the state and create the processes whereby a coherent program for the intelligent utilization of state-owned land and resources can be adopted. Clearly, the statute does not contemplate the surplusing of state-owned lands for the sole purpose of benefiting one particular state lands trust fund over another.
As to your specific inquiry, the nature of the grant and its purpose as well as any specific statutory exclusions must be examined before a determination can be made regarding state land subject to the provisions of subsection (5) of s 253.034, F.S., as amended. For example, subsection (6) of the statute, among other things, specifically provides that the provisions of s 253.034
shall not be construed so as to affect `[s]overeignty lands not leased for private uses and purposes.' Thus, the statute would not affect the disposition of the proceeds from the sale of sovereignty lands.
In inquiring whether lands given to the state for a specific purpose can be declared surplus pursuant to s 253.034(5), you specifically refer to Section 16 lands. Section 16 lands as discussed in Question One were granted to the State of Florida by the United States to be used for public school purposes. A few Florida judicial decisions have discussed the nature of the grant. In State ex rel. Town of Crescent City v. Holland, 10 So.2d 577 at 590 (Fla. 1942), the court stated: `All the proceeds of . . . the sixteenth sections or school lands and other special grants of lands, if any, go to the specific purposes of the grants.' This conclusion was founded on the provisions of the 1885 Constitution requiring that the State School Fund receive the proceeds from the sale of state school property. As stated earlier, this provision of the 1885 Constitution was converted to a statute, now s 228.151, F.S., and was subsequently revised by Ch. 72-221, Laws of Florida. See also, Hampton v. State Board of Education,105 So. 323 (Fla. 1925), stating that the sales of school lands are for the principal of the state school fund which shall remain sacred and inviolate.
In a modern case, Askew v. Sonson, 409 So.2d 7 (Fla. 1981), the Florida Supreme Court examined the nature of the federal grant of school lands under the 1968 Constitution. The court initially noted: `This grant of school lands [5 State. 742 and43 U.S.C. § 851] was an absolute grant, vesting title in the state of Florida.' Id. at 9. The supreme court commented on the effect of the deletion of a reference to school lands from the 1968 Constitution: `In adopting the constitution of 1968, the people of the state of Florida obviously recognized that the purposes of the section sixteen grant had been accomplished and deleted from the 1968 constitution reference to the grant as a source of the state school fund.' Id. at 11. The court failed to note, however, that the former constitutional provision was retained as a statute by operation of Art. XII, s 10, State Const. The court went on to make its position clear as to disposition of school lands. `Although the source of these lands was a grant from the the United States government, once the lands vested in the state of Florida, the state was authorized to deal with these lands in any manner not inconsistent with the Florida Constitution.' Id. The court quoted from 63 Am.Jur.2d Public Lands s 107 (1972): `Following a grant, the lands and the proceeds thereof are under the control of the state legislature, and it may deal with them in any manner not inconsistent with the express commands of the state constitution.' However, the court failed to quote from another section of that same source which provides: `A school grant is an absolute grant, and not one on a condition subsequent. Title to such lands is vested in the states, but it does not have all of the incidents of other titles. A state takes title as trustee, to administer the property for the support of public schools, and claimants of school lands are charged with knowledge of such relationship.' 63A Am.Jur.2d Public Lands s 112 (1984). For a survey of how other states have dealt with this issue, see
annotations to 43 U.S.C.S. s 851, note 7. See also, 73A C.J.S. Public Lands s 82 which provides: `After the title to school lands has vested in the state, such lands are not subject to any further legislation by Congress; the absolute control of such lands, where not transferred, is in the state, and it is for the state to determine how and by whom these lands shall be managed.'
In light of the Florida Supreme Court's decision in Askew v. Sonson, supra, it would appear that the state is not precluded from disposing of state school lands (section 16 and lieu lands) in any manner not inconsistent with the Constitution. Thus, if the Board of Trustees of the Internal Improvement Trust Fund determines that state school lands come under the circumstances specified in subsection (5) of s 253.034, F.S., as amended, then such lands could be disposed of pursuant to those provisions. Seealso, AGO 83-77.
In AGO 83-77 this office concluded that s 253.034, F.S., as amended by Ch. 83-223, Laws of Florida, must be regarded as an exception to or a qualification of the more general provisions of ss 270.22 and 270.23, F.S. (1982 Supp.), to the extent of their repugnancy, if any. Based upon that conclusion, that opinion went on to determine that the proceeds of the sale of any Murphy Act lands disposed of pursuant to s 253.034, F.S., shall be deposited in the Conservation and Recreation Lands Trust Fund. This conclusion was premised on the rule of statutory construction that, when one statute covers an entire subject and a later statute embraces only a particular part of the same subject, they should be construed together, and the statute relating to the particular part of a general subject operates as an exception to or qualification of the general term of the more comprehensive statute only to the extent of the repugnancy. Citing, State exrel. Loftin v. McMillan, 45 So. 882 (Fla. 1908); American Bakeries Co. v. Haines City, 180 So. 524 (Fla. 1938); State v. Gay,29 So.2d 623 (Fla. 1947); Fidelity Gas Co. of New York v. Bedingfield, 60 So.2d 489 (Fla. 1952); State v. Young,357 So.2d 416 (2 D.C.A. Fla., 1978); Carcaise v. Durden, 382 So.2d 1236 (5 D.C.A. Fla., 1980). Of course, the conclusion of AGO 83-77 as to the disposition of Murphy Act lands is changed as a result of the 1984 legislative amendments discussed under Question 1 E. of this opinion. Attorney General Opinion 83-77 further concluded that proceeds from the sale or disposition of certain lands or water storage areas pursuant to s 375.031, F.S., should be deposited in the Land Acquisition Trust Fund.
The effect of the conclusion reached in AGO 83-77 was that the disposition provisions of s 253.034, F.S., prevail over the more general provisions of ss 270.22 and 270.23, F.S., as to state lands disposed of pursuant to s 253.034. Therefore, the proceeds from the sale or any state lands (ordinarily disposed of pursuant to the general provisions of ss 270.22 and 270.23, F.S.), if properly disposed of pursuant to s 253.034, should be placed, pursuant to subsection (5) of s 253.034, in the Conservation and Recreation Lands Trust Fund. This conclusion would affect the disposition of proceeds derived from the sale of certain categories of state-owned land discussed in this opinion under Question 1 such as internal improvement lands, swamp and overflowed lands, and school lands as discussed above, requiring such proceeds to be deposited in the Conservation and Recreation Lands Trust Fund. Section 253.034, F.S. (1984 Supp.), specifically exempts from its provisions sovereignty lands not leased for private uses and purposes.
You also ask whether the fact that lands are producing rental income would preclude the board of trustees from declaring such lands surplus pursuant to s 253.034, F.S. (1984 Supp.). This statute authorizes the board to dispose of certain lands determined to be of no benefit to the public. Section 253.034 does not include the fact that lands are producing income as a factor to be considered by the board in making a determination whether such lands are of no benefit to the public. Cf., paragraph (a) of subsection (5), s 253.034, requiring each state agency to indicate to the board of trustees which lands are not being used for the purposes for which such lands were originally leased. This category of surplus lands (not used for originally leased purposes) is subject to the board's disposal authority under subsection (5). And see, subsection (3) of s 253.034 which provides in pertinent part: `No management agreement, lease, or other instrument authorizing the use of lands owned by the Board of Trustees of the Internal Improvement Trust Fund shall be executed for a period greater than is necessary to provide for the reasonable use of the land for the existing or planned life cycle or amortization of the improvements.' Reviewing the terms of this statute and its legislative history, it appears that the fact that land is producing rental income would not preclude the board of trustees from making a determination pursuant to s 253.034 that the land is of no benefit to the public. However, any attempt to dispose of surplus state lands pursuant to s 253.034, may not adversely affect any vested rights of subject leaseholders. See,e.g., Aerojet-General Corp. v. Askew, 511 F.2d 710 (5th Cir. 1975), cert. denied, 423 U.S. 908 (1975) (application of statute requiring the board of trustees to offer land to county prior to other disposition to impair vested contractual rights would violate constitution); Trustees of Internal Improvement Fund v. Root, 51 So. 535 (Fla. 1910) (the powers and duties of the trustees of the internal improvement fund with reference to lands irrevocably vested in them for state purposes by statute are subject to legislative control, when rights of third parties are not involved).
In summary, I am therefore of the opinion:
 1. Twenty-five percent of the proceeds from the sale of Internal Improvement Lands should be paid into the State School Fund with the balance to be paid into the Internal Improvement Trust Fund. Proceeds from the lease or rental of Internal Improvement Lands should be deposited in the Internal Improvement Trust Fund.
 2. Twenty-five percent of the proceeds from the sale of swamp and overflowed lands should be paid into the State School Fund with the remainder to be paid into the Internal Improvement Trust Fund. Proceeds from the rental or lease of swamp and overflowed lands are to be paid into the Internal Improvement Trust Fund.
 3. Proceeds from the sale, rental or lease of sovereignty lands should be paid into the Internal Improvement Trust Fund.
 4. Proceeds from the sale of reclaimed lake bottom lands located within the boundaries of the former Everglades Drainage District should be paid into the State School Fund. Proceeds from the sale of reclaimed lake bottom lands outside the boundaries of the former Everglades Drainage District should be distributed with twenty-five percent paid into the State School Fund and the remainder paid into the Internal Improvement Trust Fund. Proceeds from the rental or lease of both types of reclaimed lake bottom lands should be paid into the Internal Improvement Trust Fund.
 5. Proceeds from the sale or rental of Murphy Act lands are to be deposited in the Internal Improvement Trust Fund.
 6. Proceeds from the sale or rental of school lands should be paid into the State School Fund.
 7. Proceeds from the sale or rental of land obtained pursuant to Ch. 375, F.S., should be deposited in the Land Acquisition Trust Fund.
 8. Specific statutes pertaining to other state lands should be reviewed in order to determine the proper disposition of the proceeds derived from the sale or lease of the lands in question.
 9. Where a particular type of state-owned land is exchanged for private lands or other public lands, the land obtained by the Board of Trustees in the exchange should be classified as the type of state-owned land for which it was exchanged.
 10. State-owned lands which are not being used for the purpose for which they were originally leased, or lands owned by the board not actively managed by any state agency or for which a land-management plan has not been completed, are subject to disposal under subsection (5) of s 253.034, F.S. (1984 Supp.).
 11. State school lands if determined by the Board of Trustees of the Internal Improvement Trust Fund to come within the criteria specified in subsection (5) of s 253.034, F.S. (1984 Supp.), can be disposed of pursuant to that statute. Other categories of state-owned lands, such as internal improvement lands, swamp and overflowed lands, which come within the criteria specified in subsection (5) of s 253.034, can be disposed of pursuant to that statute. Sovereignty lands not leased for private uses and purposes are specifically exempted from the provisions of s 253.034, and therefore cannot be disposed of pursuant to that statute. Proceeds from the sale of state-owned lands disposed of pursuant to s 253.034, F.S. (1984 Supp.), should be deposited in the Conservation and Recreation Lands Trust Fund. While the fact that land is producing rental income would not preclude board of trustees from making a determination pursuant to s 253.034
that land is of no benefit to the public, any attempt to dispose of surplus state lands pursuant to s 253.034 may not adversely affect any vested rights of subject leaseholders.
Sincerely,
Jim Smith Attorney General
Prepared by: Craig Willis
Assistant Attorney General
[1] Swamp and overflowed lands are generally distinguished from submerged lands lying under navigable water which are lands acquired by the state by virtue of the admission of the State of Florida into the Union and are known as a type of sovereignty lands. See, Martin v. Busch, 112 So. 274 (Fla. 1927). And see, South Florida Farms Co. v. Goodno, 94 So. 672 (Fla. 1922).